UNITED STATES of America, Plaintiff,

v.

Elving J. KJELLSTROM, Marjorie Kjellstrom, Douglas R. Kjellstrom, Sharon L. Kjellstrom, Gary Kjellstrom, Renee Kjellstrom, Randy E. Kjellstrom, Jane M. Kjellstrom, and Dennis L. Kjellstrom, Defendants.

No. 95–C–0091–C.

United States District Court,
W.D. Wisconsin.

Jan. 10, 1996.

posed findings of fact that there is no genuine dispute about the following material facts.

Rachel I. Wollitzer, Trial Attorney, Tax Division, Washington, DC, for Plaintiff.

James Gebhart, Stroud, Stroud, Willink, Thompson & Howard, Madison, WI, for Elving J. Kjellstrom, Marjorie Kjellstrom, Douglas R. Kjellstrom, Sharon L. Kjellstrom, Gary Kjellstrom, Renee Kjellstrom, Randy E. Kjellstrom, Jane M. Kjellstrom, Dennis L. Kjellstrom.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief. Plaintiff seeks recovery of investment tax credit refunds issued to defendants, who are shareholders (and spouses of shareholders) of Wisco Industries, Inc., a Wisconsin subchapter S corporation. Defendants filed a counterclaim for the recovery of the refunds, which they claimed under a transition rule exception to the repeal of the investment tax credit in the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (1986), that applies only to property used in a company's "world headquarters." Defendants contend that Wisco's facilities qualify for the exemption.

The case is before the court on the parties' cross-motions for summary judgment. I conclude that plaintiff is entitled to summary judgment. Plaintiff has demonstrated that the world headquarters exception in the Tax Reform Act is intended to benefit Merrill Lynch or at most, companies similarly situated to Merrill Lynch, and was not meant to benefit defendants who are shareholders of a company with no operations or employees outside the United States. Moreover, even if the world headquarters exception did apply to defendants, some of the property upon which their claim for a tax credit is based is not qualified "transition property," as defined by the Tax Reform Act and is therefore not excepted from the repeal of the investment tax credit.

Solely for the purpose of deciding the parties' motions, I find from the parties' pro-

## UNDISPUTED FACTS

Wisco Industries, Inc., is a Wisconsin corporation owned by defendants-counterclaim plaintiffs Elving and Marjorie Kjellstrom and their sons Douglas, Gary, Randy and Dennis Kjellstrom. Elving Kjellstrom is the chief executive officer of the company and his sons hold various offices or positions within the company. Wisco is a manufacturing company engaged in the manufacture and sale of contract metal stamping for original equipment manufacturers and fast food equipment.

Wisco's offices are located in Oregon, Wisconsin, where the company has approximately 6,000 square feet of office space and 144,000 square feet of manufacturing space. Wisco's management and officers conduct the business of the company from this location. Wisco has a separate assembly plant with approximately 45,000 square feet of plant space, located approximately three miles from its headquarters in Oregon. Wisco's only other facility is in Cullman, Alabama. It has approximately 6,000 square feet of office space and 38,000 square feet of plant space.

Wisco executed the lease for the Oregon building in July 1974. It is the first and only lessee of the building. Elving Kjellstrom owns the building and signed the lease for himself as lessor and on behalf of Wisco as lessee. From time to time, additions have enlarged the building. Amendments to the lease were made in 1976, 1981 and 1985 to take the added space into consideration.

Wisco has approximately 230 employees, of whom approximately 200 are located at the facilities in Oregon, and the rest are employed in Cullman, Alabama. Wisco does not lease or own space in any buildings outside the United States; none of its manufacturing operations are conducted outside the United States; and it does not have any employees outside the United States. In Wisco's 1989 and 1990 fiscal years, a limited percentage of Wisco's sales consisted of sales to companies located outside the United States or to other

companies within the United States that sold Wisco products to foreign companies.

Through its shareholders, Wisco elected to be treated as a subchapter S corporation for federal income tax purposes and is therefore not subject to income tax. All Wisco shareholders are required to report their own pro rata share of the corporation's income, loss, deductions or credit on their individual income tax returns. In 1989 and 1990, neither Wisco nor the Kjellstroms included the investment tax credit claimed by the Kjellstroms in this case on the returns they filed with the Internal Revenue Service. On or about September 15, 1992, Wisco filed an amended 1989 S corporation federal income tax return, claiming an additional $42,479 investment tax credit that it had not reported on its previously filed return. Wisco identified a number of pieces of computer equipment and information systems placed in service in 1988 and 1989 as property upon which the claimed tax credit was based. In December 1992 and January 1993, the Kjellstroms amended their income tax returns to reflect their pro rata shares of the additional investment tax credit claimed in the amended 1989 Wisco return. In February, March and April of 1993, refund checks were sent to defendants in the amounts claimed by them on their amended returns.

Wisco filed an amended S corporation federal income tax return for tax year 1990, claiming an additional $15,085 investment tax credit not reported previously. Subsequently all of the Kjellstroms amended their income tax returns to claim their pro rata share as shareholders of the additional investment tax credit claimed on the 1990 Wisco return. The Internal Revenue Service did not issue any of the claimed refunds on the 1990 Wisco return, with the exception of one to Douglas and Sharon Kjellstrom.

On or about November 26, 1993 and August 2, 1995, the Internal Revenue Service sent letters to each of the Kjellstroms, advising them that all of the refund checks had been issued erroneously and demanding return of the refunds. When the Kjellstroms refused to return the refunds, the United States brought this action to recover them. The Kjellstroms filed protests with the Internal Revenue Service on January 11, 1995 for the 1990 refunds that had been denied by the Internal Revenue Service. On August 25, 1995, the Internal Revenue Service sent the Kjellstroms notices of disallowances of their claims and the Kjellstroms filed their counterclaim for refunds in this action.

## OPINION

### A. The Requirements of the World Headquarters Transition Rule

#### 1. The provisions of § 204(a)(7)

Prior to the 1986 Tax Reform Act, taxpayers were allowed a credit against income tax liability for up to ten percent of their investment in certain tangible depreciable property in the year the property was placed in service. H.R.Conf.Rep. No. 99–841, 99th Cong., 2d Sess. II–50 (1986), U.S.Code Cong. & Admin.News 1986, p. 4138. The 1986 Tax Reform Act repealed this investment tax credit for any property placed in service after December 31, 1985. Pub.L. No. 99–514, 100 Stat. 2166 § 211 (codified as amended in scattered sections of 26 U.S.C.). However, § 49(b)(1) of the act provided that the repeal would not apply to transition property, as defined in § 49(e). 26 U.S.C. § 49(b)(1). Section 49(e) defines "transition property" as "any property placed in service after December 31, 1985, and to which the amendments made by § 201 of the Tax Reform Act of 1986 do not apply...." 26 U.S.C. § 49(e)(1).

The property to which the amendments made by § 201 do not apply is described in several transitional rules set forth in § 204 of the 1986 Tax Reform Act. The transitional rule at issue in this case is § 204(a)(7), which provides:

Certain leasehold improvements.—The amendments made by section 201 shall not apply to any reasonable leasehold improvements, equipment and furnishings placed in service by a lessee or its affiliates if—

(A) the lessee or an affiliate is the original lessee of each building in which such property is to be used,

(B) such lessee is obligated to lease the building under an agreement to

lease entered into before September 26, 1985, and such property is provided for such building, and

(C) such buildings are to serve as world headquarters of the lessee and its affiliates.

For purposes of this paragraph, a corporation is an affiliate of another corporation if both corporations are members of a controlled group of corporations within the meaning of section 1563(a) of the Internal Revenue Code of 1954 without regard to section 1563(b)(2) of such Code. Such lessee shall include a securities firm that meets the requirements of subparagraph (A), except that the lessee is obligated to lease under a lease entered into on June 18, 1986.

Pub.L. No. 99–514, 100 Stat. 2155 § 204(a)(7) (codified as amended in scattered sections of 26 U.S.C.). Defendants contend that Wisco meets the requirements of § 204(a)(7) because it is the original lessee of the headquarters building in Oregon, it entered into the lease of the building before September 25, 1985 and it uses the building as its "world headquarters."

### 2. The narrow construction of § 204(a)(7)

The investment tax credit was enacted to stimulate economic growth by reducing the cost of acquiring new business equipment. *Pacific Far East Line, Inc. v. United States*, 544 F.2d 478, 483, 211 Ct.Cl. 71 (1976). It was repealed when Congress determined that the tax credit was not stimulating investment in depreciable property and was not functioning as an incentive for economic growth. Congress believed that a better way to achieve equitable taxation would be to provide for longer depreciation periods. H.R.Rep. No. 426, 99th Cong., 1st Sess. 145 (1985). In making the change, Congress recognized it would work a hardship on certain companies that had relied to their detriment on the old law. For that reason, Congress enacted transitional rules to provide limited tax relief to companies that had, for example, agreed to construct new buildings and make investments in depreciable property with the understanding that the property would be exempt from taxation.

■ Although the investment tax credit was intended to be construed liberally and included a provision to that effect, the general rule is that transition rules offering tax credits are to be construed strictly in accordance with Congress's intent. *Helvering v. Northwest Steel Mills*, 311 U.S. 46, 49, 61 S.Ct. 109, 111–12, 85 L.Ed. 29 (1940) (provisions of tax statutes granting exemptions are to be strictly construed). *See also United States v. Hemme*, 476 U.S. 558, 566, 106 S.Ct. 2071, 2076–77, 90 L.Ed.2d 538 (1986) (court will not impute to Congress an unstated intention); *Commissioner v. Drovers Journal Pub. Co.*, 135 F.2d 276, 278 (7th Cir.1943) (deductions from gross income must be construed narrowly and strictly). Because tax deductions and credits are within the discretion of the legislature, the courts will not expand them beyond what Congress has intended. *See New Colonial v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790–91, 78 L.Ed. 1348 (1934) (deductions depend on legislative grace); *Commissioner v. Fiske's Estate*, 128 F.2d 487, 489 (7th Cir.), *cert. denied*, 317 U.S. 635, 63 S.Ct. 63, 87 L.Ed. 512 (1942) (deductions are narrowly construed).

■ The transition rules in the Tax Reform Act were challenged unsuccessfully in *Apache Bed. Apts. Ltd. v. United States*, 987 F.2d 1174 (5th Cir.1993). In reversing the district court's decision that the taxpayers had standing to challenge the transition rules, the Court of Appeals for the Fifth Circuit noted that the " 'transition rules' … provided specified exemptions from designated provisions of the new tax laws to a very, very few specified favored taxpayers." *Id.* at 1175. Similarly, the legislative history to § 204(a)(7) indicates that Congress intended a limited application of the world headquarters transition rule. On June 10, 1986, the Senate Finance Committee entered into the Congressional Record a list of the intended beneficiaries of the transition rules. The world headquarters transition rule appears on pages 1510 and 1511 of H.R. 3838. H.R.Res. 3838, 99th Cong., 1st Sess. (1985). In the Congressional Record, Merrill Lynch is listed next to page number 1510, indicating that Merrill Lynch was the intended benefi-

ciary of the world headquarters transitional rule. 132 Cong.Rec. 13090 (1986).

On September 18, 1986, the Senate issued the conference report for H.R. 3838. Section 204(a)(7) appears on page I–75 of the conference report along with a transitional rule pertaining to natural gas pipelines. Before the passage of the final version of the Tax Reform Act, the Senate again entered into the Congressional Record the intended beneficiaries of H.R. 3838 that corresponded to the page number of the conference report listing the various transition rules with their intended beneficiaries. 132 Cong.Rec. 26638 (1986). The Congressional Record indicates that Merrill Lynch, Sonat Offshore Drilling, Kern River Pipeline and Tri–Cities Sewage are to benefit from the rules listed on page I–75 of the Conference Report. (The only two rules appearing on page I–75 are the world headquarters transition rule and the rule pertaining to natural gas pipelines. The most logical interpretation is that the world headquarters transitional rule applies to Merrill Lynch and the transitional rule pertaining to natural gas pipelines applies to the other gas-related companies.) After discussing several other transition rules besides § 204(a)(7), the conference report states that "the other special transition rules" are "of limited application." H.R.Conf.Rep. No. 99–841, 99th Cong., 2d Sess. II–62 (1986). U.S.Code Cong. & Admin.News 1986, p. 4150. Thus, the conference report supports the conclusion that the world headquarters exception is to be construed narrowly.

■ In addition to these explicit provisions in the Congressional Record suggesting that Congress interpreted the world headquarters transition rule narrowly, debates on the House floor and subsequent newspaper publications indicate that Merrill Lynch was the intended beneficiary of 204(a)(7). Although defendants are correct that less weight should be given to statements made during floor debates than to direct language in the statute or the official committee reports, comments by individual legislators *supported* by statutory language and committee reports are indicative of Congress's intent. *In re Kelly,* 841 F.2d 908, 912 n. 3 (9th Cir.1988).

Shortly before the passage of H.R. 3838, Representative Newt Gingrich of Georgia made a speech on the House floor, stating that Merrill Lynch was the intended beneficiary of the transitional rule applied to world headquarters buildings. 131 Cong.Rec. 35285 (1986). The transitional rules were discussed on the floor of the Senate on June 17, 1986. In discussing the transition rules, Senator Howard Metzenbaum from Ohio stated:

> Mr. President, the bill repeals the investment tax credit effective as of January 1, 1986. However, among other beneficiaries of transitional relief, Merrill Lynch will qualify for tax credits on office equipment and leasehold improvements for its new world headquarters building not for a short period but in perpetuity.

132 Cong.Rec. 14113 (1986). It is likely that Senator Metzenbaum's reference to "other beneficiaries of transitional relief" referred to taxpayers who would benefit from the other transition rules that were part of the Tax Reform Act.

After the passage of the Tax Reform Act in the House, the beneficiaries of the transitional rules were printed in *The New York Times.* On page D–16, the article entitled "Special Exemptions in the Tax Bill, as Disclosed by the Senate" states, "Following are the transition rules, showing the beneficiary and, when available, the estimated costs to the Government in revenue." *N.Y. Times,* Sept. 26, 1986, at D16. Under the rule referred to as "exceptions to depreciation and investment tax credit provisions," Merrill Lynch is listed as an intended beneficiary.

■ The other provisions of § 204(a)(7) reflect the special circumstances of the Merrill Lynch world headquarters building and suggest that Merrill Lynch was the intended beneficiary of the rule. According to an article appearing in *Business Week* in 1985, Merrill Lynch and the developer Olympia & York Developments Ltd. agreed that Olympia & York Developments Ltd. would construct two new office towers to be leased to Merrill Lynch. Terri Thompson, *The New York Market Settles Down to a Steady Toll, Business Week,* Aug. 12, 1985, at 64. Section 204(a)(7)(B) provides that "Such lessee is ob-

ligated to lease the building under an agreement to lease entered into before September 26, 1985." The term "agreement to lease" suggests that an agreement to lease, as opposed to the lease itself, needs to be reached before September 26, 1985. Considered in conjunction with the legislative history indicating that Merrill Lynch was an intended beneficiary of § 204(a)(7), this provision suggests that Congress intended the transition rule exception to apply to companies that commit to construct property in the future. Section 204(a)(7)(A)'s requirement that the lessee be the "original lessee" indicates also that Congress intended the provision to benefit lessees of newly constructed buildings. In addition, § 204(a)(7)(C) provides that the buildings "are to serve" as world headquarters. This is evidence that the drafters envisioned the building would serve as a world headquarters at some point in the future. Wisco does not meet this definition because Wisco's headquarters are not located in a newly constructed building. Although additions were made to the building, the building itself has been in existence at least since 1974, when it was first leased to Wisco by Elving Kjellstrom. Although it is plausible that § 204(a)(7) was meant to benefit other companies besides Merrill Lynch, Congress could not have intended to benefit every company who leased newly constructed world headquarters buildings, unless that company was similarly situated to Merrill Lynch and entered into an agreement to lease before September 26, 1985. Wisco fails to meet these requirements and therefore is not entitled to the world headquarters exemption.

Defendants argue that the language of § 204(a)(7) does not provide explicitly that Merrill Lynch is the sole beneficiary of the exemption and that the exemption needs no further construction. Defendants' reading of the statute ignores both the legislative history of § 204(a)(7) and the teaching of the case law that the transition rules should be read narrowly. Defendants are correct that, in other subsections of 204(a), Congress limited the provisions expressly to specific taxpayers. However, § 204 of the act contains several pages of highly specific transition rules. In contrast, § 203 of the act contains general transition rules that apply more broadly to several groups of taxpayers. Although some of the transition rules in § 204 are more specific than others, they are specific enough to be understood as applying to specific individual taxpayers. As plaintiff notes in its brief, the difference in the degree of detail in the wording of the transition rules is more likely due to the fact that the rules were requested and drafted by different lawmakers responding to requests from constituents.

It would run counter to Congress's clear intent to interpret § 204(a)(7) as applying to any company that enters into a lease agreement prior to September 26, 1985 for a building that can be labeled a world headquarters. Transition rules were intended to provide limited exemptions for certain taxpayers who would be affected adversely by a new law because they had relied on the old law to their detriment. Section 204(a)(7) provides transitional relief for companies like Merrill Lynch that entered into a new lease for the construction of a building with the understanding that certain depreciable property would be exempt from taxation. By contrast, Wisco signed its lease back in 1974 and did not rely detrimentally on the old law. Wisco cannot argue reasonably that it had an expectation interest that the provisions of the old law would never be repealed.

Nothing in the legislative history indicates that Congress intended to provide an exemption for *all* taxpayers who had leased world headquarters buildings prior to 1985 and as early as 1974. To read the statute this broadly would undermine Congress's intent as it is evidenced in the legislative history to the Tax Reform Act. Consequently, I conclude that § 204(a)(7) was intended to benefit Merrill Lynch and possibly other companies that entered into an agreement to lease newly constructed world headquarters prior to September 26, 1985. Wisco does not meet these requirements. Therefore, it is not entitled to the transition rule exemption.

### 3. *The definition of world headquarters*

Even assuming that Wisco fell into the narrow category of companies Congress in-

tended to benefit, Wisco's property is not a "world headquarters," as required by the plain language of the transition rule. Notably, the Tax Reform Act does not define the term "world headquarters." Consequently, both plaintiffs and defendants offer various dictionary definitions of the term to support their respective positions. Even accepting the definitions offered by defendants, however, Wisco's building does not constitute a "world headquarters." Defendants rely on one of two definitions of the term "headquarters" in Webster's Third New International Dictionary (unabridged ed. 1966) which defines the term as "the administrative center of an enterprise or activity." Defendant also relies on Webster's adjectival definition of "world" as "extending or found throughout the world." Combining the two definitions, this implies that a "world headquarters" is one that has "enterprises or activities" throughout the world. However, because § 204(a)(7) was intended to benefit Merrill Lynch, the definition of world headquarters should be considered in light of the magnitude of Merrill Lynch's worldwide facilities.

■ It is undisputed that Wisco does not lease or own space in any buildings outside the United States, that none of its manufacturing operations are conducted outside the United States and that it does not have any employees in other countries. However, defendants argue that Wisco's building fits within the definition of world headquarters because a limited percentage of Wisco's sales in 1989 and 1990 was made to companies located outside the United States or to other companies within the United States that sold Wisco products to foreign companies. As a result, Wisco issued orders from its headquarters to vendors, freight transporters, distributors and customers that were situated abroad or that distributed Wisco products to foreign customers. None of this makes Wisco's a "world headquarters," particularly when the company has no employees or facilities abroad. "World headquarters" connotes an administrative command center where orders are issued to other international facilities. It is commonly understood that to be a "world headquarters," a company must have international operations and employees outside the United States. Because the depreci-

able property at issue is not located in a world headquarters building as contemplated by the drafters of § 204(a)(7), I conclude that § 204(a)(7) does not apply to Wisco.

### B. *Whether Wisco's Equipment is Qualified Property*

Even if the world headquarters exception did apply to Wisco, certain pieces of property at issue in this case would not qualify for the investment tax credit. The world headquarters transition rule is excepted from the repeal of the investment tax credit, pursuant to § 49(a) and § 49(e), as enacted by § 211 of the Tax Reform Act. Section 49(a) provides an exception from the repeal of the investment tax credit for "transition property." Section 49(e) defines "transition property" as "any property placed in service after December 31, 1985, and to which the amendments made by § 201 of the Tax Reform Act of 1986 do not apply." Section 49(e)(1)(C) states that:

> (C) in the case of transition property with a class life of less than 7 years—
>
> (i) section 203(b)(2) of such Act shall apply, and
>
> (ii) in the case of property with a class life—
>
> (I) of less than 5 years, the applicable date shall be July 1, 1986, and
>
> (II) at least 5 years, but less than 7 years, the applicable date shall be January 1, 1987....

26 U.S.C. § 49(e)(1)(C).

■ Subsection (ii) provides that the property must be placed in service by January 1, 1987, if it has a class life of at least five years but less than seven years. This provision applies to the computer equipment at issue in this case, which has a class life of six years, according to an Internal Revenue Procedure published on October 19, 1987. Rev.Proc. 87–56, 1987–42 I.R.B. 4. It is undisputed that defendants placed the computer equipment at issue in service in 1989 and 1990. Consequently, the property does not qualify for relief from taxation under the transition rule.

Defendants focus on 49(e)(1)(C)(i), which provides that § 203(b)(2) of the act shall apply. Defendants argue that the computer equipment at issue should be treated as having a class life of twenty years because § 203(b)(2)(C)(ii) states that "property described in § 204(a) shall be treated as having a class life of 20 years." Pub.L. No. 99–514, 100 Stat. 2144 § 203(b)(2)(C)(ii) (codified as amended in scattered sections of 26 U.S.C.). According to defendants, Wisco's property should be treated as having a class life of twenty years because the equipment placed in service in Wisco's headquarters is "property described in section 204(a)." Section 203(b)(2)(A) states that property with a class life of twenty years or more must be placed in service by January 1, 1991 to be eligible for the investment tax credit. *Id.* at § 203(b)(2)(A). Defendants argue that the property at issue qualifies because it was placed in service in 1988 and 1989.

However, defendants downplay the fact that § 49(e)(C)(i) is followed by subsection (ii), which provides that the applicable placed-in-service date shall be January 1, 1987 for property with a class life of at least five years but less than seven years, and they ignore the Internal Revenue Procedure published on October 19, 1987, indicating that computer equipment has a class life of six years. Rev.Proc. 87–56, 1987–42 I.R.B. 4. Defendants respond that subparagraphs (i) and (ii) of § 49(e)(1)(C) are inconsistent and that sections 203(b)(2)(A) and 203(b)(2)(C)(ii) are controlling in determining the placed-in-service dates for Wisco's property under § 204(a)(7) because they are limited in their application to § 204(a). By contrast, 49(e)(1)(C) is not limited expressly to determinations under § 204 and has a broader and more general scope. However, the fact that § 49(e)(1)(C) does not apply solely to "property described in § 204(a)" does not render ineffective the clear provisions of § 49(e)(C)(1). In addition, § 49(e)(1)(C) applies expressly to "transition property with a class life of *less than 7 years.*" 26 U.S.C. § 49(e)(1)(C) (emphasis added). Thus, 49(e)(1)(C)(i)'s requirement that section 203(b)(2) shall apply (and that provision's reference to "property described in § 204(a)" as having a class life of twenty years) cannot include transition property with a class life of less than seven years. Because the computer equipment and information systems on which Wisco claims the tax credit were not placed in service before January 1, 1987, the property does not qualify for relief from taxation under the transition rule.

## ORDER

IT IS ORDERED that the motion for summary judgment of plaintiff United States of America is GRANTED and the motion for summary judgment of defendants Elving J. Kjellstrom, Marjorie Kjellstrom, Douglas R. Kjellstrom, Sharon L. Kjellstrom, Gary Kjellstrom, Renee Kjellstrom, Randy E. Kjellstrom, Jane M. Kjellstrom and Dennis L. Kjellstrom is DENIED. The clerk of court is directed to enter judgment for plaintiff United States of America and close this case.