**KIMBERLY–CLARK TISSUE CO., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 97–C–134.

United States District Court, E.D. Wisconsin.

March 2, 1999.

Herbert Odell, & Philip Karter, Odell & Partners, LLP, Bala Cynwyd, PA, Thomas L. Shriner, Jr., Foley & Lardner, Milwaukee, WI, for plaintiffs.

Gerald B. Leedom, U.S. Department of Justice, Tax Division, Washington, DC, for defendants.

## DECISION AND ORDER RE: PLAINTIFF'S PROTECTIVE MOTION FOR SUMMARY JUDGMENT ON THE ORIGINAL ISSUE DISCOUNT CLAIM AND RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE INVESTMENT TAX CREDIT ISSUE

CALLAHAN, United States Magistrate Judge.

### I. BACKGROUND

The plaintiff, Kimberly–Clark Tissue Company, ("Kimberly–Clark") filed this action for a refund of federal income taxes allegedly erroneously assessed and collected for the taxable years ending December 31, 1983, December 28, 1985, and December 27, 1986.

On May 7, 1998, the defendant, the United States of America, ("the government"), filed a motion for partial summary judgment regarding one of the issues in this action, the investment tax credit issue. That motion has now been fully briefed and is ready for resolution.

On October 9, 1998, the government filed a motion for summary judgment on the plaintiff's primary theory of recovery, the standstill amortization agreement claim. However, on December 21, 1998, the government withdrew that motion, indicating that the submissions thus far showed that a genuine issue of material fact remained and that summary judgment would not be possible with respect to the standstill amortization agreement issue.

On October 13, 1998, the plaintiff filed a protective motion for partial summary judgment on its alternative theory of recovery, the original issue discount claim, in case the court found in favor of the gov-

ernment on the standstill amortization agreement claim. That motion has been fully briefed and is also ready for resolution. However, as discussed below, due to the government's withdrawal of its motion for summary judgment on the standstill amortization agreement issue, the plaintiff's protective motion for summary judgment on the original issue discount claim need not be decided at this time.

Jurisdiction is based on 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422. Venue is proper in the Eastern District of Wisconsin. Both the parties have consented in writing to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Local Rule 13.05(a) (E.D.Wis.).

### II. MOTION FOR LEAVE TO FILE REPLY BRIEF IN EXCESS OF FIFTEEN PAGES

As a housekeeping matter, I am granting the plaintiff's motion to file a reply brief in excess of fifteen pages, which was filed June 8, 1998.

### III. PLAINTIFF'S PROTECTIVE MOTION FOR SUMMARY JUDGMENT ON THE ORIGINAL ISSUE DISCOUNT CLAIM

There are two sets of operative facts in this action. The first set relates to the money Scott Paper Company ("Scott")[1] paid to Brascan, Ltd., a Canadian Corporation, to repurchase shares of its own stock. This set of facts gives rise to the plaintiff's primary theory of recovery, i.e., tax deductions based on amortization of a standstill agreement that was allegedly part of the stock repurchase agreement.

Specifically, the plaintiff alleges that when it repurchased its own stock from Brascan, it tendered Brascan money, warrants, and a note. According to the plaintiff, the sum amount of these three payments was in excess of the stock's fair

---

**1.** Kimberly–Clark is, for purposes of this action, the successor-in-interest to Scott Paper Company.

market value. The plaintiff presents that it made this excess payment in order to assure that Brascan would not, at least for the next fifteen years, attempt to acquire more shares of the plaintiff's stock. In other words, the excess amount was a greenmail payment made pursuant to a standstill agreement.

This same set of facts also gives rise to the plaintiff's alternate theory of recovery—that in case not all the excess money paid to Brascan is found to be attributable to the standstill agreement, some portion of that money should be attributable, and consequently deductible, as interest payments, i.e., an original issue discount.

The plaintiff brought its protective motion for summary judgment on the original issue discount claim based on this alternate theory of recovery. The plaintiff stated that it was bringing this protective motion in case I found in favor of the government on its motion for summary judgment on the standstill amortization agreement issue.

However, as discussed, the government withdrew its motion for summary judgment on the standstill amortization issue. The government acknowledges that the plaintiff's submissions on the standstill amortization issue created a genuine issue of material fact. As a result, I am precluded from granting the government's motion. A jury trial is scheduled to begin on September 9, 1999, on the standstill amortization issue.

The fact that the government withdrew its motion for summary judgment on the standstill amortization issue renders unnecessary my rendering an opinion on the plaintiff's protective motion for summary judgment on the original issue discount claim. Without knowing the jury's verdict with respect to the plaintiff's primary theory of recovery (the standstill amortization agreement), any opinion by me on the plaintiff's alternate theory of recovery would be premature. If the jury finds completely in favor of the plaintiff on its primary theory of recovery, there will be no need to consider the plaintiff's alternate theory of recovery—the original issue discount claim.

As a result, the plaintiff's protective motion for summary judgment on the original issue discount claim is denied, without prejudice.

## IV. DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE INVESTMENT TAX CREDIT ISSUE

The second set of operative facts in this case relates to the plaintiff's claiming an investment tax credit ("ITC") for the 1986 tax year, based on the world headquarters transitional rule. The undisputed facts are as follows:

During its 1986 taxable year, Scott occupied a location in Philadelphia (hereinafter "the Leasehold"), which plaintiff contends served as Scott's world headquarters. (Def. Proposed Findings of Fact, "DPFF" ¶ 1).

Since the early 1960s, Scott had occupied the Leasehold under the terms of a forty year lease dated January 23, 1959, between the Trustees of General Electric Pension Trust and J.P. Morgan & Co., Inc., trustees of certain pension trusts, as Lessors, and Scott, as Lessee. (DPFF ¶ 2). Scott was the original lessee of the Leasehold. (DPFF ¶ 3).

During 1986, Scott incurred expenses to acquire and install improvements, equipment and furnishings (hereinafter "the improvements") in and to the Leasehold. (DPFF ¶ 4). In its refund claim for the 1986 taxable year, Scott claimed an ITC for expenses claimed to have been incurred for the improvements to the Leasehold. The Internal Revenue Service ("IRS") disallowed the claim and also disallowed a derivative ITC credit carryback to the 1983 tax year. (DPFF ¶ 5).

The plaintiff does not dispute the defendant's proposed findings of fact. However, the plaintiff contends that there is a genu-

ine dispute of material fact with respect to its affirmative defense. Specifically, the plaintiff contends that: Based on at least one administrative pronouncement by the IRS in force as of the date that the plaintiff filed its claims for refund for its 1986 taxable year, it appears that the denial of the plaintiff's claim for an investment tax credit for its 1986 taxable year may have subjected the plaintiff to impermissible disparate treatment as compared to the treatment accorded other similarly situated taxpayers. (Plaintiff's PFF ¶ 1).

### B. Analysis

As stated, the defendant's proposed findings of fact are not disputed by the plaintiff. As a result, I can determine whether the plaintiff qualifies for transitional rule relief from the repeal of the ITC law. It is only if I find in favor of the defendant on this first issue that the plaintiff's alleged dispute of fact may become material.

### 1. Can the plaintiff claim ITC based on the World Headquarters Transitional Rule?

For many years prior to 1985, a taxpayer who acquired certain machinery and equipment for use in a trade or business was allowed an "investment tax credit" against income tax liability, in an amount equal to a percentage of the cost of the "qualified property." As part of the Tax Reform Act of 1986, Congress added section 49 to the Internal Revenue Code (Title 26, United States Code) which generally repealed the investment tax credit for property placed in service after December 31, 1985. However, at the same time, Congress created a limited number of transitional ITC rules, among them the following rule concerning "certain leasehold improvements":

(7) Certain Leasehold Improvements.— The amendments made by section 201 shall not apply to any reasonable leasehold improvements, equipment and furnishings placed in service by a lessee or its affiliates if—

(A) the lessee or an affiliate is the original lessee of each building in which such property is to be used,

(B) such lessee is obligated to lease the building under an agreement to lease entered into before September 26, 1985, and such property is provided for such building, and

(C) such buildings are to serve as world headquarters of the lessee and its affiliates.

Tax Reform Act of 1986, Pub.L. No. 99–514, § 204(a)(7), 100 Stat.2085 (codified as amended at 26 U.S.C. § 49(a), (e) (1986)).

This exception is commonly referred to as the world headquarters transitional rule. The requirements of the world headquarters transitional rule are cumulative. In other words, the plaintiff must meet all the requirements of subsections (A), (B), and (C), in order to qualify for an investment tax credit under this transitional rule.

The plaintiff argues, and the defendant concedes, for purposes of this motion, that the properties in which the relevant improvements, equipment and furnishings were placed in service in 1986 constituted the world headquarters of the plaintiff and its affiliates. As a result, the requirement of subsection (C) of § 204 has been met. In addition, there is no disagreement that the plaintiff was the original lessee of the building in question. As a result, the requirements of subsection (A) have been met. There is also no disagreement that the property at issue was provided for use in the plaintiff's world headquarters. Finally, there is no disagreement that the plaintiff did enter into an agreement to lease the building before September 26, 1985. The plaintiff had leased and occupied the building since the early 1960s.

The issue is whether the prospective language of the section, including: "is to be used", in subsection (A); "agreement to lease", in subsection (B); and, "are to

serve" in subsection (C) limit the applicability of the transitional rule to newly constructed world headquarters, as the defendant claims. According to the defendant, the fact that the plaintiff had entered into its lease in the early 1960s, and had occupied the building since approximately the same time, precludes it from claiming an investment tax credit pursuant to the transitional rule.

The defendant's interpretation of the transitional rule finds support in *U.S. v. Kjellstrom*, 916 F.Supp. 902 (W.D.Wis. 1996), in which the court found that the application of the transitional rules was intended by Congress to be very limited. In *Kjellstrom*, the taxpayer sought an investment tax credit on computer equipment and information systems placed in service in 1988 and 1989. The equipment and systems were to be used in the company's headquarters, which the company had leased since 1974.

The court in *Kjellstrom* found that the taxpayer did not qualify for the world headquarters transitional rule investment tax credit. It found that the taxpayer's headquarters were not world headquarters. It also found that some of the equipment and systems placed in service were not "qualified property." However, more relevant to our discussion here today, the court also found that Congress only intended the transitional rules to apply to taxpayers who were building new headquarters and had only entered into "an agreement to lease" rather than into the lease itself as of September 26, 1985.

Is so holding, the Court looked to the legislative history of the transitional rules to determine how broadly to apply them. The Court found that, "the general rule is that transition rules offering tax credits are to be construed strictly in accordance with Congress' intent." *Kjellstrom*, 916 F.Supp. at 905 (citing *Helvering v. Northwest Steel Mills*, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29 (1940)). The court in *Kjellstrom* then examined the Congressional Record made in conjunction with the passage of § 204.

The Congressional Record indicates that Merrill Lynch was intended to be the primary beneficiary of § 204(a)(7). See 132 Cong.Rec. 26638 (1986); 131 Cong.Rec. 35285 (1986); and 132 Cong.Rec. 14113 (1986). Merrill Lynch and developer Olympia & York had agreed that Olympia & York would construct two new office towers to be leased to Merrill Lynch. *Kjellstrom*, 916 F.Supp. at 906–07. Apparently, such buildings had not been leased, or built, when the investment tax credit was repealed in 1986. However, Merrill Lynch had relied, to its detriment, on the promise of an investment tax credit. As a result, according to the court in *Kjellstrom*, the transitional rules were enacted to allow Merrill Lynch (and perhaps a very small number of other companies, very similarly situated), to still claim the investment tax credit.

The court in *Kjellstrom* went on to state that "nothing in the legislative history [of § 204(a)(7) ] indicates that Congress intended to provide an exemption for all taxpayers who had leased world headquarters buildings prior to 1985 and as early as 1974." *Kjellstrom*, 916 F.Supp. at 907. The term "agreement to lease" suggests that an agreement to lease, as opposed to the lease itself, needs to be reached before September 26, 1985. Considered in conjunction with the legislative history indicating that Merrill Lynch was an intended beneficiary of § 204(a)(7), this provision suggests that Congress intended the transition rule exception to apply to companies that commit to construct property in the future. Section 204(a)(7)(A)'s requirement that the lessee be the "original lessee" indicates also that Congress intended the provision to benefit lessees of newly constructed buildings. In addition, § 204(a)(7)(C) provides that the buildings "are to serve" as world headquarters. This is evidence that the drafters envisioned the building would serve as a

world headquarters at some point in the future.

*Id.* at 907.

Consequently, the court in Kjellstrom concluded "that § 204(a)(7) was intended to benefit Merrill Lynch and possibly other companies that entered into an agreement to lease newly constructed world headquarters prior to September 26, 1985." *Id.* As a result, the court held that the transitional rule did not apply to the plaintiff, which had occupied its world headquarters since 1974.

The Seventh Circuit affirmed the district court's decision in Kjellstrom. See *United States v. Kjellstrom,* 100 F.3d 482 (7th Cir.1996). However, it did so on the grounds that the taxpayer's headquarters did not constitute a "world headquarters." In dicta, it stated that "unlike the district court, we do not hold that the [transitional rule] was possibly limited to the securities firm of Merrill Lynch and Company. It was meant to give relief to comparable companies, but [this taxpayer] is not such. Because [the taxpayer] has no affiliates and its Oregon offices do not constitute 'world headquarters,' it is plain that [the taxpayer] is not entitled to the investment tax credit." *Kjellstrom,* 100 F.3d at 484. In so holding, the Seventh Circuit cited *Airborne Freight Corp. v. United States,* No. C95–301R, 1996 WL 608548 (W.D.Wash.1996), rev'd on other grounds, 153 F.3d 967 (9th Cir.1998).

In *Airborne,* the taxpayer had entered into a ten year lease agreement on September 29, 1983, for a building which was to be constructed. The taxpayer occupied portions of the building before September 26, 1985. The government argued that the taxpayer did not qualify for the investment tax credit pursuant to the world headquarters transitional rule because the taxpayer failed to meet two criteria of § 204(a)(7). Specifically, the government asserted that the taxpayer had to enter into an agreement to lease an entire building before September 26, 1985, but not occupy any part of the building until after that date. *Airborne,* 1996 WL 608548, at *1.

However, the district court disagreed with the government on both assertions. It held that:

> As the government points out, provisions granting special tax exemptions are to be strictly construed. *Helvering v. Northwest Steel Mills,* 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29 (1940); *Estate of Bell v. C.I.R.,* 928 F.2d 901, 903 (9th Cir.1991). Nevertheless, the court is bound by the plain language of the tax code and cannot read words into the relevant provisions. There is nothing in the plain language of § 204(a)(7) requiring the lessee to enter a lease agreement for an entire building. Even assuming such a requirement, Airborne did agree to lease the majority of the building with options to lease the remaining vacant spaces. Airborne always intended to be the sole tenant, and did, in fact, end up leasing the entire building. Nor is there any language in § 204(a)(7) stating that the building must be leased before September 26, 1985, but not occupied until after that date in order to qualify for the world headquarters exception.

*Id.* at *2.

The court in *Airborne* then discussed the district court's decision in *Kjellstrom.* The court disagreed with the district court's decision in Kjellstrom. The district court in Airborne also distinguished the taxpayer in *Airborne* from the taxpayer in *Kjellstrom:*

> This court concludes that, given the plain and unambiguous language of the tax code itself, there is no need to consult the legislative history. But even if the court were to consider that history, the result would be the same. According to the legislative history, the purpose of § 204(a)(7) was to permit corporations which had agreed to lease a building in reliance upon the continuation of the investment tax credit, but which were unable to complete reason-

able leasehold improvements before the repeal of the tax credit, to receive an exemption from that repeal. That is precisely the situation in which Airborne found itself. Thus, Airborne's situation is much more akin to that of Merrill Lynch than was that of the corporation in *Kjellstrom.*

*Id.*

As stated, the Ninth Circuit Court of Appeals reversed, in part, the district court's decision in *Airborne.* See *Airborne Freight Corp. v. United States,* 153 F.3d 967 (9th Cir.1998). However, the Ninth Circuit affirmed the district court's decision that the world headquarters transitional rule applied. See *Airborne,* 153 F.3d at 972.

The government repeated its argument to the Ninth Circuit that:

the exception should apply to taxpayers who were obligated to lease the building before September 26, 1985, but *had not leased the building by that date.* It also argues that, to qualify, the taxpayer must have agreed to lease the *entire* building. If these narrow constructions are not adopted, according to the government, the purpose of the exception will be frustrated: taxpayers who agreed to lease and leased buildings decades before the repeal of the investment credit will be entitled to avail themselves of the transitional exception.

*Id.* at 970.

However, the Ninth Circuit disagreed with the government, instead holding:

The difficulty with the government's argument is that none of the words italicized in the previous paragraph were written into § 204(a)(7). There is no disqualification of those who executed leases before September 26, 1985, and the government offers no reason why the execution of a lease creates a relevantly different condition from that

which existed under an agreement to lease.

*Id.*

As a result, the Ninth Circuit found that the taxpayer did qualify, at least in that regard, for the investment tax credit.

We decline therefore to write the government's additional proposed restrictions into the statute in order to confine the exception virtually to a class of one. We have no quarrel with the government's argument that, in light of its purpose, the exception should be available only to those whose expectations at the time they undertook their obligations would otherwise be defeated by the repeal of the investment credit. Airborne qualifies, however, under such a guiding principle.

*Id.*

In addition, the Ninth Circuit reasoned that its ruling would not open the proverbial floodgates:

Our conclusion that Airborne meets the requirements of § 204(a)(7) is not likely to open the floodgates envisioned by the government. Other companies that leased their world headquarters decades ago cannot have had their expectations defeated as they entered and originally equipped their buildings long before the repeal of the investment credit. Moreover, the opportunity for other taxpayers to take advantage of the world headquarters exception expired, at the latest, on January 1, 1991. See § 203(b)(2)(A). The exception remains a narrow and temporally limited one.

*Id.* at 971.

In the instant action, the government argues that the district court's analysis in *Kjellstrom* was correct, and that the district court (and presumably, the Ninth Circuit) in *Airborne* rested its analysis on an incorrect interpretation of the transitional rule.

While the government does acknowledge that any taxpayer who comes within the conditions of the leasehold improvements

transition rule is entitled to its benefit, it argues that the Congressional intent underlying the world headquarters transition rule was clearly intended to benefit Merrill Lynch.

The crux of the government's argument is that an agreement to lease is not the same as a lease. In support of this argument, the government cites 26 U.S.C. § 48(h)(8) (1966) and 26 U.S.C. § 49(b)(6) (1969). In both those instances, the Internal Revenue Code speaks of either "a binding lease *or* a contract to lease." As such, the government asserts that the inclusion of the language "agreement to lease" in the world headquarters transition rule means that no taxpayers who were already leasing their world headquarters prior to September 26, 1985, could benefit from the transition rule. Otherwise said, the failure of Congress to include the words "lease" or "contract to lease" in the transitional rule precludes taxpayers such as the plaintiff from claiming an investment tax credit pursuant to the world headquarters transitional rule.

The government argues that such a limit is consistent with Congress's intent in passing the world headquarters transitional rule. Specifically, according to the government. Congress' intent in passing the world headquarters transitional rule was to provide relief in situations in which taxpayers had relied on the then-existing law to purchase eligible property that had yet to be "constructed, reconstructed, or acquired." See section 203(b)(1) of the Tax Reform Act of 1986.

The government argues that further support for its position can be found in other language of the world headquarters transitional rule. Specifically, the words "is to be used" of subsection (A), and "are to serve" of subsection (C) indicate that the taxpayer cannot already occupy its world headquarters. The government also argues that the district court decided the *Airborne* case incorrectly. Specifically, according to the government, the district court in *Airborne* failed to recognize the distinction between an agreement to lease and a lease itself.

Upon review of the Congressional Record, it is clear that Merrill Lynch was intended to be one of the beneficiaries of the world headquarters transitional rule. See 131 Cong.Rec. H11487–02; and 132 Cong.Rec. S00000–32. However, nothing in the Congressional Record indicates that Congress intended Merrill Lynch to be the sole beneficiary of this transitional rule.

If Congress intended Merrill Lynch to be the sole beneficiary, it certainly could have drafted this transitional rule more carefully. Indeed, later subsections of the statute which list companies that are to be excluded from the repeal of the investment tax credit are more specific than this particular subsection.

One example of such specificity is as follows:

(8) SOLID WASTE DISPOSAL FACILITIES.—The amendments made by section 201, and section 203(c), shall not apply to the taxpayer who originally places in service any qualified solid waste disposal facility (as defined in section 7701(e)(3)(B) of the Internal Revenue Code of 1986) if before March 2, 1986—

(A) there is a binding written contract between a service recipient and a service provider with respect to the operation of such facility to pay for the services to be provided by such facility,

(B) a service recipient or governmental unit (or any entity related to such recipient or unit) made a financial commitment of at least $200,000 for the financing or construction of such facility,

(C) such facility is the **Tri–Cities Solid Waste Recovery Project** involving **Fremont, Newark, and Union City, California,** and has received an authority to construct from the Environmental Protection Agency or from a State or local agency authorized by

the Environmental Protection Agency to issue air quality permits under the Clean Air Act. (emphasis added).

Tax Reform Act of 1986, Pub.L. No. 99–514, § 204(a)(8), 100 Stat.2085.

Similarly, the repeal of the ITC was not to apply to:

CERTAIN SUBMERSIBLE DRILLING UNITS.—In the case of a binding contract entered into on October 30, 1984, for the purchase of 6 semi-submersible drilling units at a cost of $425,000,-000, such units shall be treated as having an applicable date under subsection 203(b)(2) of January 1, 1991.

Tax Reform Act of 1986, Pub.L. No. 99–514, § 204(a)(9), 100 Stat.2085.

The amendments made by section 201 shall not apply to a 30 megawatt electric generating facility fueled by geothermal and wood waste, the approximate cost of which is $55,000,000, and with respect to which a 30–year power sales contract was executed on March 22, 1985.

Tax Reform Act of 1986, Pub.L. No. 99–514, § 204(a)(30), 100 Stat.2085.

A review of these sections indicates much more specificity than the world headquarters transitional rule at issue in this action. To reiterate, had Congress intended the world headquarters transitional rule to apply only to Merrill Lynch and a small number of nearly identically situated companies, it could have drafted this transitional rule much more narrowly.

Moreover, I find that § 204(a)(7) is clear as drafted. As a result, I must follow the language of the statute in determining whether the plaintiff qualifies under the transitional rule.

Where the language and purpose of the questioned statute is clear, courts, of course, follow the legislative direction in interpretation. Where the words are ambiguous, the judiciary may properly use the legislative history to reach a conclusion. And that method of determining congressional purpose is likewise applicable when the literal words would bring about an end completely at variance with the purpose of the statute.

*United States v. Public Utilities Commission,* 345 U.S. 295, 315–16, 73 S.Ct. 706, 97 L.Ed. 1020 (1953).

As stated, I find that the language of the statute is clear. The government attempts to find ambiguity in the statute, in order to necessitate looking at the legislative history and other provisions of the Internal Revenue Code. However, because the language of the statute is clear, I do not believe that it is necessary to look to its legislative history.

The overall purpose of § 204 was to provide exceptions for the repeal of the ITC. It is with that purpose in mind that I must read the plain language of the statute to determine whether the plaintiff qualifies for an ITC under the world headquarters transitional rule.

■ Upon review of the transitional rule and the *Kjellstrom* and *Airborne* decisions, I am persuaded that the plaintiff qualifies under such rule. The plaintiff meets all requirements of the rule. It is undisputed that it is the original lessee of its world headquarters in Philadelphia; it entered into a lease prior to September 26, 1985; and, the property in question was to be used in the plaintiff's world headquarters and the buildings were to serve as the plaintiff's world headquarters.[2]

---

2. Much has been said about the fact that the world headquarters transitional rule was enacted to give relief to taxpayers who had relied on the existence of an ITC to their detriment. There is nothing in the record showing that the plaintiff either did or did not rely on the promise of an ITC when deciding to update and improve its world headquar-

ters. However, I do not believe that reliance on the continued existence of the ITC is a prerequisite to being able to claim an ITC based on the world headquarters transitional rule. As a result, whether the plaintiff relied on the continued existence of the ITC is immaterial.

There is no requirement in the transitional rule that the property or building be newly constructed. If Congress had intended the transitional rule to apply only to newly constructed world headquarters, it could have included such language in the rule. However, the plain language of the rule does not include the words newly-constructed. Indeed, the plain language of the rule speaks to "any reasonable leasehold *improvements,* equipment and furnishings." (emphasis added). The use of the word *improvements* in the rule is in contradiction to the idea of newly constructed buildings. Improvements can only be made to something that is already constructed.

Although the government seems to be asking me to, it is not my duty to add unwritten restrictions when interpreting a rule. The Seventh Circuit stated this principle in rejecting an opinion of the Tax Court: "we find no basis therein for our undertaking to put words into the statute that, whatever the reasons may have been, Congress did not put there. Our task is to construe and apply, not to write, legislation." *International Trading Co. v. C.I.R.,* 484 F.2d 707, 710–11 (7th Cir.1973). As a result, I will not write the words "newly constructed" into the world headquarters transitional rule.

I also find the government's attempt to distinguish an "agreement to lease" from a "lease" unconvincing. Although these could be two different documents, they are not necessarily so. After all, an agreement to lease can be synonymous with a lease agreement. The interpretation that the government attempts to give the words "agreement to lease" would more properly be called an "agreement to enter into a lease agreement" or an "agreement to enter into an agreement to lease."

In addition, the plain language of the statute does not speak to property that *will be leased,* or parties that *will be lessees,* as would be expected were I to accept the government's interpretation of the rule. Instead, the rule speaks of "lease-

holds" and "lessees". And, although the statute does not define "leasehold" or "agreement to lease," Black's Law Dictionary defines a leasehold as "an estate in real property held by lessee/tenant under a lease."

The use of the word "leasehold" in the transitional rule leads me to the same conclusion as the use of the word "improvements" i.e., that the rule is not limited to property that is to be leased, but not yet leased. It seems to me that property cannot be a leasehold, or a party a lessee, unless a lease has been entered into. If there is no lease, there is no lessee; nor, is there a leasehold. There is just a party and a property. And, the transitional rule does not speak of parties and properties. It speaks of lessees and leasehold and improvements. As such, the plain language of the rule leads me to the conclusion that a party who has already entered into a lease is among those who are intended beneficiaries of the rule.

Finally, I find that including the plaintiff as a beneficiary of the world headquarters transitional rule is not inapposite to strictly construing this special tax exemption, as is required of me. See *Helvering v. Northwest Steel Rolling Mills,* 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29 (1940). As stated, this rule is limited to taxpayers who purchased qualified property or made leasehold improvements to their world headquarters, of which they were the original lessee, between 1986 and 1991. This is a limited number of taxpayers. It is limited by definition and by timing. Those taxpayers who fit this definition, including Merrill Lynch and this plaintiff, should be allowed to benefit from the world headquarters transitional rule. In sum, and for all of the foregoing reasons, the defendant's motion for summary judgment on the investment tax credit issue is denied.

**2. Was the plaintiff the victim of disparate treatment by the I.R.S.?**

As discussed earlier in this decision, there are two issues before me: first,

whether the plaintiff qualified for the world headquarters transitional rule exception to the repeal of the investment tax credit; and, second, if it did not, whether the plaintiff was the victim of impermissible disparate treatment.

The plaintiff argues that if the court were to find in favor of the government on the first issue, there is a potential issue of material fact with respect to the second issue. Specifically, the plaintiff contends that: Based on at least one administrative pronouncement by the IRS in force as of the date that the plaintiff filed its claims for refund for its 1986 taxable year, it appears that the denial of the plaintiff's claim for an investment tax credit for its 1986 taxable year may have subjected the plaintiff to disparate treatment as compared to the treatment that may have been accorded other taxpayers who may have been similarly situated. (Plaintiff's PFF ¶ 1).

However, because I have found in favor of the plaintiff on the first issue—i.e., finding that it qualifies for the world headquarters transitional rule exception to the repeal of the ITC, I do not have to consider the disparate treatment issue. And, as a result, whether the plaintiff was treated disparately is immaterial.

### V. CONCLUSION

For the aforementioned reasons, **IT IS HEREBY ORDERED** that the plaintiff's motion to file a reply brief in excess of fifteen pages, filed June 8, 1998, is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that the plaintiff's protective motion for summary judgment on the original issue discount claim is hereby **DENIED,** without prejudice;

**IT IS FURTHER ORDERED** that the defendant's motion for partial summary judgment on the investment tax credit issue is hereby **DENIED.**