114 T.C. No. 3

UNITED STATES TAX COURT

PAYLESS CASHWAYS, INC., AND ITS SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26342-95.          Filed February 16, 2000.


P equipped and furnished 5 of 11 floors of a building it leased for its corporate headquarters.  The owner of the building was a limited partnership (TPS) in which P had a 16-2/3-percent interest.  TPS signed a contract for the construction of the building on Apr. 4, 1985.  P took possession of the leased space in October 1986.

P claimed an investment tax credit for its taxable year ending Nov. 29, 1986, for the cost of the equipment and furnishings acquired and placed in service at P's corporate headquarters.  R disallowed the claimed credits.

The Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2085, generally repealed the investment credit for property acquired or placed in service after Dec. 31, 1985.  However, P's claim for investment tax

credit relies on transition rules contained in TRA
secs. 204(a)(7) (world headquarters rule) and
203(b)(1)(C) (equipped building rule), 100 Stat. 2156,
2144.

Held:  In order for a taxpayer to have a "world
headquarters" within the meaning of TRA sec. 204(a)(7),
a taxpayer must have substantial international
operations which are directed from the headquarters.
The existence of employees stationed outside the United
States, exports or foreign source income, liability for
foreign taxes, a foreign permanent establishment, and
having foreign subsidiaries or foreign joint venture
operations are all indicia of international operations.
P did not have any of these indicia in the year in
question.  P's importation of some merchandise for
domestic sale and borrowing from banks and other
lenders who participated in the international capital
markets were not sufficient evidence of substantial
international operations to characterize P's
headquarters as a "world headquarters" under TRA sec.
204(a)(7).

Held, further:  TRA sec. 203(b)(1)(C) (equipped
building rule) requires the taxpayer claiming the
investment tax credit to have a specific written plan
and to have incurred or be committed to more than one-
half of the total cost of the equipped building by Dec.
31, 1985.  P failed to establish that it had a specific
written plan, or that it had incurred or committed more
than one-half of the total cost of the equipped
building before Jan. 1, 1986, as required by TRA sec.
203(b)(1)(C).

Frederick Brook Voght, Rhonda Nesmith Crichlow, David F.
Levy, Michael E. Baillif, and Rajiv Madan, for petitioners.

Michael L. Boman, for respondent.

RUWE, Judge:  Respondent determined a deficiency in
petitioners' Federal income tax for their taxable year ending
November 29, 1986, in the amount of $240,298.  The deficiency

results from a disallowance of claimed investment tax credits attributable to leasehold improvements, furnishings, and equipment acquired for, and placed in service at, petitioners' corporate headquarters during petitioners' 1986 taxable year. Petitioners now claim they are entitled to an investment credit in an amount greater than claimed on their return. The sole issue for decision is whether petitioners (hereinafter referred to as Payless) are entitled to an investment tax credit pursuant to one of the transition rules contained in the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2085.[1] An unrelated issue involving a claimed net operating loss carryback will require a Rule 155[2] computation.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Payless' principal place of business was located in Kansas City, Missouri, when the petition was filed. Payless has had its corporate headquarters

---

[1]The transition rules relied on are secs. 204(a)(7) (world headquarters rule) and 203(b)(1)(C) (equipped building rule) of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2085, 2156, 2144, respectively.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

at Two Pershing Square, 2300 Main Street, Kansas City, Missouri (Two Pershing Square), since October 1986.

Payless is a full-line building materials supplier serving the home improvement, maintenance, and repair market. Payless' customers include both "do-it-yourself" customers and professional contractors such as remodelers, residential builders, and other similar businesses that purchase large quantities of building materials. In the year in issue, Payless operated 181 stores in 23 States and had 13,685 employees.

Payless' sales for 1986 were $1,525,648,000. During 1986, Payless purchased merchandise from approximately 3,000 different suppliers. Payless purchased some of its merchandise, including home improvement products, equipment, supplies, and materials from foreign manufacturers and vendors. Beginning in 1981, Payless purchased merchandise from foreign sources through its import department with the assistance of various purchasing agents. None of the purchasing agents utilized by Payless were employees of Payless. Beginning in 1985, Payless purchased merchandise from foreign sources through Multi-Growth, Ltd., a limited liability company organized under the laws of Hong Kong.[3] In 1986, Payless' cost of merchandise sold was $1,041,678,000. In 1986, Payless purchased merchandise from foreign manufacturers

---

[3]The record does not disclose any ownership interest held by Payless in Multi-Growth, Ltd., and petitioner did not assert any such interest on brief.

and vendors for sale in its stores totaling $24,924,968.  This entire amount was purchased from 28 manufacturers and vendors in Taiwan.  Prior to 1994, Payless owned no stores or other facilities outside the United States.  Before 1994, Payless had no employees located outside the United States, except when engaged in short-term travel.

In the 1980's, Payless acquired two companies, Knox Lumber and Somerville Lumber.  Payless ran those companies as separate wholly owned entities with their own boards of directors, presidents, and operating systems.  Both companies had their own subsidiary headquarters; Knox's headquarters was in Minnesota, and Somerville's headquarters was in Massachusetts.  Payless also maintained regional headquarters located in Indianapolis, Dallas, Denver, Phoenix, Houston, and Sacramento.  Each regional headquarters is managed by a regional vice president.  Each of the subsidiary and regional headquarters reports to Payless' corporate headquarters at Two Pershing Square, which houses Payless' top corporate managers and staff.

Physical construction of the building that houses Payless' corporate headquarters, Two Pershing Square, began on or about October 15, 1984.  At all relevant times, legal title to Two Pershing Square was held by Two Pershing Square, Ltd. (TPS).  TPS was a limited partnership organized on October 15, 1984, under the laws of the State of Missouri pursuant to an agreement

between Trizec Properties, Inc. (Trizec), and PCI Building Corp. (PCI), a wholly owned subsidiary of Payless. Trizec owned an 83-1/3-percent interest in TPS, and PCI owned the remaining 16-2/3-percent interest.[4] Trizec and PCI made initial capital contributions of $2,500,000 and $500,000, respectively. TPS developed Two Pershing Square and operated Two Pershing Square until November 27, 1992, at which time the partnership was dissolved and Trizec took over ownership and operational responsibilities. On April 4, 1985, TPS contracted with DiCarlo Construction for the construction of Two Pershing Square (construction contract). After April 4, 1985, DiCarlo Construction relied on the plans incorporated by reference in the construction contract to construct Two Pershing Square.

Payless took possession of its headquarters office space at Two Pershing Square in October 1986. Payless equipped, furnished, and leased parts of 5 of 11 floors in the building. Under the terms of the lease, Payless was initially obligated to rent approximately 41 percent of the office space at Two Pershing Square and was entitled to exercise options in the future to lease the additional office space above the first floor in that building.

---

[4]The record does not definitively disclose whether PCI was a limited or general partner in the TPS partnership. Trizec, however, executed Payless' lease agreement as the general partner of TPS.

In 1993, Payless agreed to an incorporated joint venture with Grupo Industrial Alfa, S.A. de C.V. (Alfa), a Mexican company.  Alfa and Payless agreed to establish and operate stores selling home improvement products in Mexico.  On October 18, 1993, Payless and Alfa executed a shareholders agreement that initiated the Mexican business venture.  In the shareholders agreement, Payless and Alfa agreed to capitalize Payless de Mexico, S.A. de C.V. (Payless de Mexico) to distribute and sell building materials and home improvement products in Mexico.  Payless held a 49-percent interest in Payless de Mexico.  Payless de Mexico planned to build a chain of 25 stores in Mexico.  In a supply agreement dated October 18, 1993, Payless agreed to supply Payless de Mexico with merchandise and products from its distribution centers.  On December 12, 1994, Payless de Mexico opened its first store in Monterey, Mexico.  In 1995, Payless sold its interest in Payless de Mexico to Versax, S.A. de C.V., a subsidiary of Alfa.

### OPINION

Before 1986, taxpayers who acquired certain machinery and equipment for use in a trade or business were allowed an investment tax credit (ITC) against income tax liability in an amount equal to a percentage of the cost of the "qualified property".  Secs. 38, 46, 48.  TRA section 211, 100 Stat. 2166, generally repealed the investment tax credit for property placed

in service after December 31, 1985.  The repeal was subject to a limited number of transitional ITC rules.  TRA section 204(a), 100 Stat. 2146, contains a number of specific transition rules. There are also three general transition rules contained in TRA section 203(b), 100 Stat. 2143.[5]  TRA section 211 generally repealed the regular investment tax credit by adding section 49 to the Code.  See TRA sec. 211(a).  Section 49(e) provides an exception for "transition property", which is defined as property placed in service after December 31, 1985, to which the amendments made by TRA section 201, 100 Stat. 2121, do not apply. Sec. 49(e)(1).

World Headquarters Rule

One of the transitional rules in TRA section 204(a) deals with property used in a leased building that serves as "world headquarters" of the lessee and its affiliates.  TRA section 204(a)(7) provides:

> (7)  Certain Leasehold Improvements.--The amendments made by section 201 shall not apply to any reasonable leasehold improvements, equipment and furnishings placed in service by a lessee or its affiliates if--
>
> > (A) the lessee or an affiliate is the original lessee of each building in which such property is to be used,

---

[5]The rules found in TRA sec. 203(b) are known as the binding contract rule, the self-constructed property rule, and the equipped building rule.  See TRA sec. 203(b)(A), (B), and (C). Only the equipped building rule, TRA sec. 203(b)(C), is relevant to this case.

(B) such lessee is obligated to lease the building under an agreement to lease entered into before September 26, 1985, and such property is provided for such building, and

(C) such buildings are to serve as world headquarters of the lessee and its affiliates.

For purposes of this paragraph, a corporation is an affiliate of another corporation if both corporations are members of a controlled group of corporations within the meaning of section 1563(a) of the Internal Revenue Code of 1954 without regard to section 1563(b)(2) of such Code. Such lessee shall include a securities firm that meets the requirements of subparagraph (A), except the lessee is obligated to lease the building under a lease entered into on June 18, 1986.

This exception is commonly referred to as the world headquarters rule. The requirements of the world headquarters rule are cumulative. Payless must prove that it meets all the requirements of subparagraphs (A), (B), and (C) in order to qualify for an investment tax credit under this transitional rule. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Respondent argues that Payless fails to meet the requirements of the world headquarters rule because: (1) Payless did not lease the entire building at Two Pershing Square, and (2) Payless' headquarters at Two Pershing Square was not a "world headquarters".

TRA section 204(a)(7) contains no explicit requirement that

the "entire" building be leased by the taxpayer to qualify for ITC. Respondent acknowledges that his argument that the provision implicitly contains such a requirement has been rejected by both the District Court for the Western District of Washington and the Court of Appeals for the Ninth Circuit in Airborne Freight Corp. v. United States, 78 AFTR 2d 96-6272, 96-2 USTC par. 50,552 (W.D. Wash. 1996), affd. in part and revd. in part 153 F.3d 967 (9th Cir. 1998). On this point, the Court of Appeals stated: "There is also no requirement [in TRA section 204(a)(7)] that the whole building be leased." 153 F.3d at 970. As the Court of Appeals indicated, the difficulty with the Government's argument is that the word "entire" was not written into the language of TRA section 204(a)(7). Id. For the same reason, we also decline to accept this implied restriction as part of the statute in order to restrict its application.

We must next decide whether Two Pershing Square was Payless' "world headquarters". There is no dispute that Two Pershing Square was Payless' corporate headquarters. What is in dispute is whether Payless' international activities were sufficient to qualify its corporate headquarters as a "world headquarters".

The term "world headquarters" is not defined in the relevant TRA provisions, nor is it defined in the Code. When a word is undefined in a statute, it is a fundamental canon of statutory construction that it will be interpreted as taking its ordinary,

contemporary, common meaning.  See <u>Commissioner v. Soliman</u>, 506 U.S. 168, 174 (1993); <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979).  In <u>United States v. Kjellstrom</u>, 916 F. Supp. 902 (W.D. Wis. 1996), affd. 100 F.3d 482 (7th Cir. 1996), the District Court rejected an argument that a limited percentage of sales made to foreign customers qualified the taxpayer's headquarters as a "world headquarters".

We believe that an essential requirement of a "world headquarters" is that a company have substantial international operations or intend to have such operations in the immediate future.  Having employees outside the United States is one indicium of international operations.  Other indicia of international operations might include exports or foreign source income, payment of foreign taxes, or the existence of a foreign permanent establishment such as a subsidiary or joint venture operation in a foreign country.  Payless had no exports or foreign source income.  Before 1994, Payless owned no stores or other facilities outside the United States and had no employees located outside the United States, except when engaged in short-term travel.

Despite having no foreign facilities or employees stationed outside the United States and no sales outside the United States, Payless argues that it has sufficient "international activities" to justify classifying its headquarters as a "world

headquarters". Payless principally relies on three international activities: The purchase of merchandise from foreign manufacturers and vendors for domestic sale; the use of foreign capital markets; and participation in an incorporated joint venture in Mexico in 1993-95.

In the year in issue, Payless made foreign merchandise purchases of $24,924,968 from 28 manufacturers and vendors located in Taiwan. During that year, Payless had a total cost of merchandise sold of $1,041,678,000. Payless' cost of goods sold from foreign vendors and manufacturers was less than 2.4 percent of the total cost of goods sold in 1986. In 1985, goods purchased from foreign manufacturers and vendors accounted for less than 1.3 percent of Payless' total cost of goods sold. During Payless' 1987 and 1988 tax years, this percentage was 2.1 percent of the total cost of goods sold.[6] We do not think that the mere purchasing of foreign-made goods directly from a foreign

---

[6]Payless stipulated the number of foreign manufacturers and vendors from whom it purchased merchandise, the countries in which these manufacturers and vendors were located, and the total amounts of foreign merchandise purchases per year. Nevertheless, at trial some of Payless' witnesses testified that other foreign source merchandise was purchased, such as lumber from Canada. No documentation of those purchases is in evidence, and the testimony is vague as to years and amounts. However, it appears that these items were purchased from sellers who were doing business in the United States and had offices and distribution facilities within the United States. Such purchases within the United States would not transform an otherwise domestic retail operation into a worldwide business whose headquarters would be its "world headquarters" within the meaning of TRA sec. 204(a)(7).

manufacturer or vendor or through foreign independent purchasing agents in these relative quantities is a strong indicator of substantial international operations.[7] Nor do we find the fact that lending institutions with international operations participated in Payless' corporate borrowing program supports a finding that Payless had international operations.

Finally, while the words of the transition rule "such buildings are to serve as world headquarters", are prospective, we find nothing in the provision itself or the legislative history that would indicate that those words should be read so that they include a building becoming a "world headquarters" at some indeterminate time in the future. Assuming without deciding that the Mexican joint venture would have justified a classification of Two Pershing Square as Payless' world headquarters in 1993-95, we find the joint venture in 1993-95 to be too remote in time to be relevant to the tax year in question. We are of the opinion that the words "are to serve", while prospective, more naturally describe the intended function of the building when first occupied by the original lessee or sometime shortly thereafter.[8]

---

[7]The fact that certain Payless employees sometimes traveled outside the United States to facilitate these purchases, when viewed alone or with the other facts petitioner relies on, is not sufficient to transform Two Pershing Square into a world headquarters.

[8]It is not necessary for us to determine in this case whether a taxpayer must have international affiliates to have a
(continued...)

On the record before us, there is insufficient evidence of the type of substantial international operations required to justify classifying Payless' corporate headquarters at Two Pershing Square a "world headquarters" as that term is used in TRA section 204(a)(7).

Equipped Building Rule

In the alternative, Payless argues that its expenditures qualify for ITC under the "equipped building rule".  TRA section 203(b)(1)(C) provides:

> (1)  In general.--The amendments made by section 201 shall not apply to--
>
>      *        *        *        *        *        *        *
>
>      (C) an equipped building or plant facility if construction has commenced as of [December 31, 1985[9]], pursuant to a written specific plan and more than one-half of the cost of such equipped building or facility has been incurred or committed by such date.

In order to qualify for transitional relief, Payless must show that:

     (1)  Construction commenced by December 31, 1985;

     (2)  Construction was pursuant to a written specific plan; and

     (3)  More than one-half of the cost of the building, including its machinery and equipment, was incurred or committed

---

[8](...continued)
world headquarters.

[9]TRA sec. 211(a) amended subpt. E of pt. IV of subch. A of ch. 1 by adding a new sec. 49.  Sec. 49(e)(1)(B) substituted "Dec. 31, 1985", for "Mar. 1, 1986", in sec. 203(b)(1)(C).

on or before December 31, 1985.

On brief, respondent concedes that the first requirement has been met in that construction commenced on or before December 31, 1985. However, respondent argues that Payless has failed to prove that it meets the remaining requirements.

Payless bears the burden of proving that it qualifies for relief under the transitional provision. See Rule 142(a); Welch v. Helvering, 290 U.S. at 115. We agree that Payless has failed to establish that more than one-half of the cost of the building, including its machinery and equipment, was incurred or committed before January 1, 1986. On brief, Payless states: "Although actual costs for equipment and furnishings of the other 2 Pershing Square space [the 59-percent of the building not leased by Payless] is not available, Payless' costs were $14,812,179 for 41 percent of the building." (Emphasis added.) H. Conf. Rept. 99-841 (Vol. II), at II-56 (1986), 1986-3 C.B. (Vol. 4) 1, 56, states:

> Where the costs incurred or committed before March 2, 1986 (January 1, 1986, for the investment tax credit) do not equal more than half the cost of the equipped building, each item of machinery and equipment is treated separately for purposes of determining whether the item qualifies for transitional relief.

Payless' failure to establish the total cost of the building, including its machinery and equipment, is fatal to the argument that more than one-half of the cost of the equipped building was committed or incurred before January 1, 1986. Without knowing the total cost, it is logically impossible to establish that more than one-half of that amount has been exceeded.

Payless would not qualify for transitional relief under TRA section 203(b)(1)(C) even if it could establish the total cost of the building because Payless did not have a written specific plan and did not incur or commit to more than one-half of the cost of the equipped building.

TRA section 203(b)(1)(C) does not explicitly state whose "written specific plan" will satisfy the requirement of the section. However, the conference report supports the proposition that the "written specific plan" referred to in the section must be the plan of the taxpayer claiming the credit. The conference report states:

> Under the equipped building rule, the conference agreement [repeal of the ITC] will not apply to equipment and machinery to be used in the completed building, and also incidental machinery, equipment, and structures adjacent to the building (referred to here as appurtenances) which are necessary to the planned use of the building, where the following conditions are met:
>
> (1) The construction (or reconstruction or erection) or acquisition of the building, machinery, and equipment was pursuant to a specific written plan of a taxpayer in existence on March 1, 1986 (December 31, 1985, for the investment tax credit); and
>
> (2) More than 50 percent of the adjusted basis of the building and the equipment and machinery to be used in it (as contemplated by the written plan) was attributable to property the cost of which was incurred or committed by March 1, 1986 (December 31, 1985, for the investment tax credit), and construction commenced on or before March 1, 1986 (December 31, 1985, for the investment tax credit).
>
> The written plan for an equipped building may be modified to a minor extent after March 1, 1986, (December 31, 1985, for the investment tax credit) and

the property involved may still come under this rule; however, there cannot be substantial modification in the plan if the equipped building rule is to apply. <u>The plan referred to must be a definite and specific plan of the taxpayer</u> that is available in written form as evidence of the taxpayer's intentions.

The equipped building rule can be illustrated by an example where the <u>taxpayer has a plan providing for the construction</u> of a $100,000 building  * * * [H. Conf. Rept. 99-841, <u>supra</u> at II-56-57, 1986-3 C.B. (Vol. 4) at 56-57; emphasis added.]

Based on the legislative history provided in the conference report, we think it a fair inference that Congress intended that the taxpayer claiming the credit would be the party required to have the relevant plan, as evidence of its intention, and that the taxpayer be the party that "incurred or committed" more than 50 percent of the adjusted basis of the building and the equipment to be used in it.[10]  We therefore hold that the taxpayer claiming the credit under the exception contained in TRA section 203(b)(1)(C) must be the party who has the specific

---

[10]Payless contends that TRA sec. 203(b)(1)(C)

was designed to protect those taxpayers who, although having committed to incur or having incurred substantial costs toward furnishing and equipping a building in a large scale project by the end of 1985, did not have all the items to be included in the completed facility reduced to a timely binding contract.

In Payless' view, a group of taxpayers could be amalgamated so that as an aggregate they would achieve the required commitment. Payless suggests no measure for what constitutes a "substantial commitment".  Additionally, petitioners' proposed interpretation of the section, by logical extension, would allow the section to be read so that a taxpayer who had committed a very minor part of the total construction and equipping costs could claim an investment tax credit if other taxpayers had committed more than half the costs of the equipped building by the cutoff date.

written plan and the party that incurred or committed more than 50 percent of the adjusted basis of the equipped building.

The specific written plan relied on by Payless is the construction contract between TPS and DiCarlo Construction. Under that contract TPS not Payless, incurred or committed the construction costs for Two Pershing Square.

The TRA transitional provisions make no accommodation for attributing costs incurred by a limited partnership to the partners for the purpose of determining whether they have "incurred or committed" costs. Even if such attribution were proper, we would be unwilling to attribute to Payless more than 16.67 percent of the costs of construction, which was the extent of Payless' interest in the TPS, partnership. If 16.67 percent of the construction costs of $36,600,000 claimed by Payless as part of its precommitted costs were attributed to Payless, and assuming we accepted Payless' total cost of the equipped building of $77,627,266 and Payless' other committed costs, Payless' commitment would amount to substantially less than 50 percent of the total estimated cost of the equipped building on or before December 31, 1985.[11]

---

[11](Ownership interest times cost of Two Pershing Square) plus tenant allowance plus equipment and furnishings equals Payless' pre-1986 committed costs ((.167 x $36,600,000) + $4,900,000 + $14,812,179 = $25,824,379. $25,824,379/total estimated costs of $77,627,266 x 100 = 33.3 percent of total

(continued...)

Payless failed to prove that it had a specific written plan or that it "incurred or committed" more than one-half of the cost of the "equipped building". For the reasons stated above, we find that Payless does not satisfy the requirements of either TRA section 203(b)(1)(C) or TRA section 204(a)(7) and is not entitled to the investment credit claimed on its 1986 return.

Decision will be entered

under Rule 155.

---

[11](...continued)
estimated costs).