**NATIONAL DATA CORPORATION & SUBSIDIARIES, Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 97–23T, 97–580T.

United States Court of Federal Claims.

July 23, 2001.

Timothy J. Peaden, Alston & Bird LLP, Atlanta, Georgia, for plaintiff.

David House, Tax Division, U.S. Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General Claire W. Fallon, for defendant.

OPINION

ALLEGRA, Judge.

For most of the period from 1962 through 1985, a taxpayer who acquired qualifying machinery and equipment for use in its trade or business was allowed an "investment tax credit" as a dollar-for-dollar offset against its income tax liability, in an amount equal to a specified percentage of its investment. The Tax Reform Act of 1986 (the Reform Act), Pub.L. No. 99–514, 100 Stat. 2085, generally

eliminated this credit for property placed in service after December 31, 1985. But, as tax acts are wont to do, the Reform Act contained transitional rules, among them an exception to the repeal for certain property placed in service in complexes classified as "world headquarters." At issue in this case is whether plaintiff was covered by this exception and thereby entitled to investment tax credits for certain property it placed in service after the effective date of the general repeal. This highly technical issue is before the court on cross-motions for summary judgment. After careful consideration of the briefs filed, the oral argument, and for the reasons discussed below, the court determines that plaintiff is not entitled to the claimed credits, and, therefore, **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motion for summary judgment.[1]

## I. FACTS

Neither party disputes the facts at issue here, which are as follows:

Plaintiff, National Data Corporation and Subsidiaries (NDC or plaintiff), is a Georgia corporation that provides electronic information services for financial, retail, health care and communications markets. On April 21, 1973, plaintiff entered into an agreement to be the original lessee of a building located at One NDC Plaza in Atlanta, once the first floor of that newly-constructed building could be occupied. The commencement date for the lease was not specified in the initial agreement, but was settled upon in a First Amendment to the Lease Agreement, which set April 27, 1973 as the lease initiation date. Under the provisions of the original agreement, as first amended, the term of the lease was 240 months, or until April 27, 1993. On September 24, 1991, however, the lease was extended to April 30, 2003, with an additional renewal term of 10 years at the option of NDC. The One NDC Plaza serves as NDC's corporate headquarters and the hub for all of its worldwide operations. From 1987 to 1990 (the four taxable years at issue here), plain-

tiff had other corporate offices located throughout the United States, as well as offices and computer centers throughout Western Europe, Japan, and Canada.

NDC's taxable year ran from June 1 to May 31. In its taxable year 1987, plaintiff placed approximately $6.5 million in leasehold improvements, equipment, furniture, and fixtures in service at the One NDC Plaza. In taxable year 1988, plaintiff placed an additional $17 million in improvements in service at the building, followed by an additional $5.5 million in improvements in taxable year 1989, and an additional $5.8 million in improvements in taxable year 1990. For each of the taxable years in question, plaintiff timely filed corporate income tax returns, but did not claim thereon investment credits for the aforementioned property. On August 8, 1994, however, plaintiff filed claims for refunds, asserting that it was entitled to investment tax credits for leasehold improvements, furnishings, and equipment placed in service at One NDC Plaza, during the four taxable years at issue. Plaintiff claimed approximately $2.1 million in tax credits, for a total refund claim of approximately $1.7 million. On September 5, 1996, the Appeals Office of the Internal Revenue Service denied plaintiff's refund claims for taxable years 1987–89, and, on August 12, 1997, it denied plaintiff's refund claim for taxable year 1990.

On January 14, 1997 and August 25, 1997, plaintiff commenced the instant consolidated suit, seeking a refund of $1,687,192, corresponding to the amounts it previously claimed on account of the investment tax credit. As noted above, this matter is before the court on the parties' cross-motions for summary judgment. The case was transferred to the undersigned judge on February 8, 2001. Oral argument was heard in this case on April 18, 2001.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56;

---

1. Because the court concludes that plaintiff is allowed no credit, it does not reach issues raised by the parties' briefs regarding the application of Section 203 of the Reform Act and the amount of credit potentially owed plaintiff.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As noted, the facts material to the motions are essentially undisputed. Based on those facts, the court concludes, as a matter of law, that defendant is entitled to summary judgment.

Before the enactment of the Tax Reform Act of 1986 (the Reform Act), Pub.L. No. 99–514, 100 Stat. 2085, section 38 of the Internal Revenue Code of 1954[2] governed a taxpayer's eligibility for the investment tax credit, while section 46 of the Code controlled the amount of such credit allowable. With permutations not here relevant, the latter section provided that "the amount of the investment credit determined under this section for any taxable year shall be an amount equal to ... the regular percentage" of a taxpayer's "qualified investment." I.R.C. § 46(a)(1). Paragraph (c)(1) of section 46 defined the term "qualified investment" as the aggregate of a defined portion of "the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year," plus a defined portion of "the cost of each used section 38 property (as defined in section 48(c)(1)) placed in service by the taxpayer during such taxable year." *Id.* at § 46(c)(1). Under these provisions, then, the amount of the credit allowed for a particular taxable year generally was determined by multiplying the regular percentage by the "qualified investment," *i.e.*, the defined portion of the basis or cost associated with certain qualifying property that was placed in service during that taxable year. *See B.F. Goodrich v. United States,* 94 F.3d 1545, 1548–49 (Fed. Cir.1996).

Section 211(a) of the Reform Act eliminated this investment tax credit by making the "regular percentage" specified in section 46(a)(1) of the Code inapplicable to "any property placed in service after December 31, 1985." § 211, 100 Stat. at 2167–68. *See also Telecom USA, Inc. v. United States,* 192 F.3d 1068, 1070 (D.C.Cir.1999), *cert. denied,* 529 U.S. 1123, 120 S.Ct. 1995, 146 L.Ed.2d

820 (2000); S.Rep. No. 99–313, at 96 (1986), U.S.Code Cong. & Admin.News, 1986, 4075, 4184. However, Congress "softened the blow slightly by providing transitional rules to ameliorate the loss of" the investment tax credit, *United States v. Commonwealth Energy Sys.,* 235 F.3d 11, 15 (1st Cir.2000), among them, a limited exception to the repeal for certain types of "transition property," including property falling within a "world headquarters" exception. *See* Pub.L. No. 99–514, § 204(a)(7), 100 Stat. 2155. The latter exception provided, in pertinent part:

> Certain leasehold improvements.—The [repeal of the investment tax credit] shall not apply to any reasonable leasehold improvements, equipment and furnishings placed in service by a lessee ... if –
>
> (A) the lessee ... is the original lessee of each building in which such property is to be used,
>
> (B) such lessee is obligated to lease the building under an agreement to lease entered into before September 26, 1985, and such property is provided for such building, and
>
> (C) such buildings are to serve as world headquarters of the lessee....
>
> Such lessee shall include a securities firm that meets the requirements of subparagraph (A), except the lessee is obligated to lease the building under a lease entered into on June 18, 1986.

*Id. See Kimberly–Clark Tissue Co. v. United States,* 38 F.Supp.2d 1028, 1031 (E.D.Wis. 1999). As noted by the Tax Court, "[t]he requirements of the world headquarters rule are cumulative," and a taxpayer "must prove that it meets all the requirements of subparagraphs (A), (B), and (C) in order to qualify for an investment tax credit under this transitional rule." *Payless Cashways, Inc., v. Commissioner,* 114 T.C. 72, 77, 2000 WL 177458 (2000). Pursuant to section 203(b) of the Reform Act, property subject to this exception was eligible for the credit provided

**2.** Section 2 of the Reform Act redesignated the "Internal Revenue Code of 1954" "as heretofore, hereby or hereafter amended" the "Internal Revenue Code of 1986." § 2, 100 Stat. at 2095.

However, references to the operative Internal Revenue Code provisions at issue here will be to Internal Revenue Code of 1954 (26 U.S.C.), unless otherwise indicated.

it was placed in service by January 1, 1991. § 203, 100 Stat. at 2144.

Plaintiff argues, and defendant concedes (at least for purposes of the cross-motions), that plaintiff met two prongs of section 204(a)(7)'s requirements—that is, it was the "original lessee" of the One NDC Plaza for purposes of subparagraph (A), and its building qualified as a "world headquarters" for purposes of subparagraph (C). However, the parties disagree as to whether NDC qualified under subparagraph (B), which requires that the "lessee is obligated to lease the building under an agreement to lease entered into before September 26, 1985." § 204, 100 Stat. at 2155. Defendant asserts that this language does not apply to a taxpayer, such as NDC, who, prior to September 26, 1985, had already signed a lease and occupied its world headquarters. It is to that issue that the court now turns.

■ In construing the "world headquarters" exception, the court must first look to whether the statutory language is plain and unambiguous. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In performing this task, it is guided by certain principles of interpretation.[3] The first, a "fundamental canon of statutory construction," is that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). The second, in many ways a corollary of the first, is

that a statute should be construed so that each part is given effect and no part is rendered inoperative or superfluous.[4] *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). The third is that "where Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Field v. Mans,* 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (internal citations omitted).[5] Lastly, yet another rule of interpretation applicable here is that "provisions granting special tax exemptions are to be strictly construed." *Helvering v. Northwest Steel Rolling Mills,* 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29 (1940).[6] This oft-quoted tax maxim has been applied in interpreting tax transition rules, *see United States v. Hemme,* 476 U.S. 558, 566–67, 106 S.Ct. 2071, 90 L.Ed.2d 538 (1986), and, specifically, in construing those of the Reform Act, including those involving the phase-out of the investment tax credit, *see Commonwealth Energy Sys.,* 235 F.3d at 15–16; *Apache Bend Apartments, Ltd. v. United States,* 987 F.2d 1174, 1175 (5th Cir.1993); *United States v. Kjellstrom,* 916 F.Supp. 902, 905 (W.D.Wis.1996), *aff'd, on other grounds,* 100 F.3d 482 (7th Cir.1996).

Applying these familiar canons to the language of section 204(a)(7), the court first trains its eye on that portion of subparagraph (B) which states "[s]uch lessee is obligated to lease the building under an agreement to lease entered into before September

---

3. *See N.L.R.B. v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) ("On a pure question of statutory construction, our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' ").

4. This rule has specifically been applied in construing the investment tax credit transition rules under the Tax Reform Act. *See Commonwealth Energy Sys.,* 235 F.3d at 15; *Bell Atlantic Corp. v. United States,* 224 F.3d 220, 224 (3d Cir.2000).

5. *See also United States v. Shabani,* 513 U.S. 10, 13, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) (stating that it is a settled principal of statutory construction that "absent contrary indications,

Congress intends to adopt the common law definition of statutory terms"); 2B Norman J. Singer, *Sutherland Statutory Construction* § 50.04 (6th ed.2000) [hereinafter *Sutherland Statutory Construction* ] (emphasizing "utility of examining a federal statute with reference to the common law of the various states as it existed at the time the statute was enacted").

6. *See also Commissioner v. Jacobson,* 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949) (exemptions "are specifically stated and should be construed with restraint" in light of the purpose of taxing income comprehensively); *Espenshade v. United States,* 173 Ct.Cl. 828, 354 F.2d 332, 336 (1965).

26, 1985." § 204, 100 Stat. at 2155. Relying on the present tense of the "is obligated" language, defendant first contends that this provision requires that a taxpayer be obligated under an "agreement to lease" as of September 26, 1985. It then predicates that an "agreement to lease" is a separate and distinct concept from that of a "lease," and refers only to an executory contract to enter into a building lease in the future. It asserts that while plaintiff originally entered into such an "agreement to lease," it was not obligated to lease the building under that agreement as of the effective date of the transition provision, but, instead, was operating under a supervening lease. As such, according to defendant, plaintiff is not covered by the transitional rule. For its part, plaintiff insists that defendant is reading requirements into the statute that simply are not there, and, in particular, contends that the term "agreement to lease" is legally synonymous with the term "lease." Thus, it maintains that it fully met the requirements of section 204(a)(7)(B), when, in 1973, *i.e.,* prior to September 26, 1985, it was the original lessor and occupant of the NDC Plaza.

For many reasons, section 204(a)(7)(B) will not bear plaintiff's interpretation. The key phrase in that statute, "agreement to lease," is neither defined in *Webster's Dictionary* nor *Black's Law Dictionary.* Nonetheless, both familiar lexicons define the term "lease" as constituting an "agreement" or a "contract"—*Webster's* defines that phrase as "a contract by which one conveys lands, tenements, or hereditaments for lie, for terms of year, or at will," *Webster's Third New International Dictionary* 1286 (1993), while *Black's* similarly describes it as "any agreement which gives rise to relationship of landlord and tenant," *Black's Law Dictionary* 889 (6th ed.1990). These definitions suggest that in common usage, a layperson would not employ the phrase "agreement to lease" or "contract to lease" to refer simply to a "lease," as the word "agreement" or "contract" is implied and subsumed within the latter concept. This observation, though a splinter of logic in the first instance, takes on

sturdier proportions when buttressed by the common law understanding of the phrase "agreement to lease," or its equivalent, "contract to lease," which, although subject to some local variation, is a familiar denizen of landlord and tenant law.

As noted in a leading treatise in this area, "[a] lease is said to convey a present estate in distinction to a contract to lease, which is to provide for the creation in the future." 3 Milton R. Friedman, *Friedman on Leases* § 34.1 (4th ed.1997) [hereinafter *Friedman on Leases* ]. Burnishing this explanation, another treatise indicates:

> it is important to distinguish leases from nonpossessory interests because important consequences depend on the distinction. For the same reason, a lease must also be distinguished from a contract to make a lease. The distinction is that a lease is a transaction that is already partially executed, while a contract to lease creates obligations that are purely executory.... A contract to lease is an agreement that contemplates the future execution of a formal lease giving the prospective tenant the right to possession; the contract to lease is purely executory, and does not itself transfer a right to possession to the prospective tenant.

2 Richard R. Powell, *Powell on Real Property* § 16.02[4] (Michael Allan Wolf ed., 2001) [hereinafter *Powell* ]. *See also* 51C C.J.S. *Landlord & Tenant* § 185a (1968) ("There is a distinction between a present lease and an executory contract to enter into a lease in that the latter vests no estate in the proposed lessee, while the former conveys an estate."). The principal *raison d'etre* of this distinction lies in the fact that a lease, unlike an agreement to lease, gives a right to possession, which, in turn, defines the relief available upon its breach—for a breach of a lease, the landlord's remedy is for accrued or accruing rent; while, for breach of an "agreement to lease," a landlord may expect only ordinary contract damages (with a corresponding duty to mitigate). *Friedman on Leases,* §§ 34.1, 34.5.[7] Cases distinguishing

---

7. *See also* Roger A. Cunningham, William B. Stoebuck & Dale A. Whitman, *The Law of Proper-*

ty 263 (2d ed.1993) (measure of damages is the "major consequence" of the distinction); J.A.

between leases and agreements or contracts to lease are legion, with one court perhaps best summing up the usual judicial formula stating, albeit simply, that "[a]n agreement to lease is not a lease, just as a contract to sell is not a sale." *Ryan v. Stanger Inv. Co.*, 620 S.W.2d 505, 508 (Tenn.Ct.App.1981).[8]

Under the statutory canons outlined above, this court must presume that Congress was aware of this common law distinction in enacting the Reform Act. But, in fact, there is evidence that Congress actually appreciated this distinction—evidence that is found, interestingly enough, in the text of two prior acts that phased out the investment tax credit for a time. In 1966, for example, Congress suspended the credit for "suspension period property," but excluded from that category property acquired "pursuant to a binding lease or *contract to a binding lease* or contract in effect on October 9, 1966." Tax Reform Act of 1966, 26 U.S.C. § 48(h)(8) (1966) (emphasis added). Similarly, in 1969,

when it terminated the credit (only to reenact it three years later), Congress continued the credit for "pre-termination property," defined as property acquired "pursuant to a binding lease or *contract to lease* in effect on April 18, 1969." Tax Reform Act of 1969, 26 U.S.C. § 49(b)(6) (1969) (emphasis added). The language and structure of these provisions belie any notion that Congress believed either that the phrases "leases" and "contract to lease" were synonymous or that the latter phrase somehow incorporated the former. Rather, when, in 1966 and 1969, Congress wanted to include both concepts in a transitional provision, it did so quite explicitly and alternatively. To conclude, as plaintiff does, that the phrase "contract to lease" covers a "lease" is blithely to assume that Congress' use of the latter term in these earlier provisions was gratuitous. Such a conclusion, however, would violate the canon, highlighted above, that "a legislature is presumed to have used no superfluous words." *Platt v. Union Pacific R.R. Co.*, 99 U.S. 48, 52, 25

---

Connelly, Annotation, *Measure of damages for lessor's breach of contract to lease or to put lessee into possession*, 88 A.L.R.2d 1024 (1963). Other state law consequences that spring from the distinction between a lease and an agreement to lease involve the proper application of statutes of fraud and recordation statutes, some of which distinguish between contracts and leases. *Powell*, § 16.02[4]. *See generally* Emory Washburn, *American Law of Real Property* 453 (1876) (noting the importance of the distinction between "agreements to lease and agreements which operate as leases" for parol evidence purposes); *Restatement (Second) of Property* § 2.5 (1977) (contract section governs contract to lease).

8. *See, e.g., Dan Cohen Realty Co. v. National Sav. & Trust Co.*, 125 F.2d 288, 289 (6th Cir.1942) ("There is a sharp and generally recognized distinction between the rights and liabilities created by an executed lease on the one hand and an executory contract to lease on the other."); *Sands v. United States*, 198 F.Supp. 880, 883 (W.D.Wash.1960), *aff'd sub nom. First Federal Sav. & Loan Ass'n of Bremerton v. United States*, 295 F.2d 481 (9th Cir.1961) (drawing distinction between "agreement to lease" and "lease"); *Feeley v. Michigan Ave. Nat'l Bank*, 141 Ill.App.3d 187, 95 Ill.Dec. 542, 490 N.E.2d 15, 18 (1986) ("An agreement to lease is a contract to formally execute a contract in the future for exclusive possession of lands or tenements for a determinate period.... A lease is generally defined as a contract for exclusive possession of lands, tene-

ments or hereditaments for life, for a term of years, or at will, or for any interest less than that of the lessor, usually for a specified rent of compensation."); *Byrd Cos., Inc. v. Birmingham Trust Nat'l Bank*, 482 So.2d 247, 253 (Ala.1985) (drawing distinction between "lease" and "agreement to lease" in applying recording statute); *Target Stores, Inc. v. Twin Plaza Co.*, 277 Minn. 481, 153 N.W.2d 832, 840 (1967) (drawing the same distinction and indicating that "[t]he fact that a document covers a building yet to be constructed implies that the transaction is at most an agreement to lease rather than a lease"); *Motels of Maryland, Inc. v. Baltimore County*, 244 Md. 306, 223 A.2d 609, 612 (1966) (distinguishing between a "contract to lease" and "lease"); *Zook v. Zook*, 11 Pa. D. & C. 203 (1928) (citing cases from the 1800s and noting that a lack of "present words of demise" distinguishes a lease from "merely an agreement to lease"). Plaintiff notes that a few treatises and cases use the phrase "agreement for lease," rather than "agreement to lease," suggesting thereby that the phrase "agreement to lease" is not a well-accepted term of art. *See, e.g., John N. Taylor. The American Law of Landlord and Tenant* 81 (1879) (referring to an "agreement for a lease"). In the court's view, however, the numerous treatises and cases cited above demonstrate to the contrary. Moreover, it is telling that plaintiff has not cited a single case at common law in which a court has construed any of the relevant phrases— "agreement to lease," "contract to lease" and "agreement for lease"—to be synonymous with the term "lease."

**30**

L.Ed. 424 (1878).[9] Indeed, because in phasing out the credit in 1966 and 1969, Congress apparently understood the meaning and common law tradition of the words it selected, it is reasonable to conclude that it had that same basic understanding in mind when, in 1986, it passed the Reform Act.[10]

■ To be sure, "[c]anons of constructions need not be conclusive," the Supreme Court recently stated, "and are often countered ... by some maxim pointing in a different direction." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, ——, 121 S.Ct. 1302, 1309, 149 L.Ed.2d 234 (2001). Yet, here, not only do all the canons harken to the same conclusion, but there is further indication in section 204(a)(7) itself that Congress understood the distinction between a lease and an agreement to lease. Thus, while, as discussed above, in subparagraph (B), the "world headquarters" exception applied to "an agreement to lease entered into before September 26, 1985," the statute also indicated, in the last sentence of paragraph (7), that the same exception would apply where "the lessee is obligated to lease under a *lease* entered into on June 18, 1986." § 204, 100 Stat. at 2155 (emphasis added). If, as plaintiff claims, a "lease" is an "agreement to lease" then why, in a single statutory paragraph, did Congress employ both phrases? Were plaintiff correct, Congress presumably would have used one phrase or the other in both places, paralleling the language in section 204(a)(7)(B) with that in the last sentence of paragraph (7). But it did not, choosing instead to employ different language and bringing into play yet another rule of statutory construction, *to wit*, that when different words are used in the same provision they are presumed to have a different meaning. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).[11] In this court's view, this canon of construction is fully applicable here, revealing the last sentence of section 204(a)(7) to be further evidence that Congress did not intend the phrase "agreement to lease" to include a "lease." [12]

9. Such a conclusion also would be inconsistent with the legislative history of the 1969 act, which again evidenced an understanding of the distinction between a "contract to lease" and a "lease." Thus, for example, in explaining the types of "pre-termination property" that would not be subject to the credit repeal, the accompanying Senate Report indicated that "neither the lessor nor the lessee may receive any investment credit with respect to property" where "property is leased after April 18, 1969 (other than pursuant to a binding contract to lease entered into before April 19, 1969)." S.Rep. No. 91–552, at 246 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2282. In recognizing that leases entered into after the effective date could qualify for the credit if the lease derived from an agreement to lease entered into before that date, the quoted language indicates that Congress not only understood the common law distinction between a "lease" and a "contract to lease," but also knew that the former type of agreement could spring from the latter.

10. Both tax-writing committees, in 1986, certainly were aware that Congress had phased out the credit on two prior occasions. Hearing testimony before those committees, leading up to the passage of the 1986 Code, indeed, highlighted this fact. *See Tax Reform Proposals—VII: Hearing before Comm. on Finance, United States Senate*, 99th Cong. 120 (1985) (statement of Robert Mercer, Chairman and Chief Executive Officer, Goodyear Tire & Rubber Co.) (discussing the earlier phaseouts); *Comprehensive Tax Reform, Part VI: Hearings before House Comm. on Ways and Means*, 99th Cong. 5390, 5407–08 (1985) (statement of David I. Margolis, Chairman of the Board, Colt Industries, Inc.) (same). *See also* Congressional Budget Office, Congress of the United States, *Revising the Corporate Income Tax* 19–21 (1985) (report to Congress discussing the history of the investment credit, including the two phaseouts).

11. *See also Hecht Co. v. Bowles*, 321 U.S. 321, 326–27, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Lindsey v. Tacoma–Pierce County Health Dep't*, 195 F.3d 1065, 1074 (9th Cir.1999); *United States v. Maria*, 186 F.3d 65, 71 (2d Cir.1999). *See generally* 2A *Sutherland Statutory Construction* § 46.06 ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

12. Notably, as originally introduced, section 204(a)(7) used the term "lease" and only later was amended to substitute the phrase "agreement to lease." *Compare* H.R. 3838, 99th Cong., 1st Sess. (1985) ("such lessee is obligated to lease the building under a **lease** entered into before September 26, 1985 ...") (emphasis added); H.R. 3838, 99th Cong., 2d Sess. (1986) (same) *with* the Reform Act ("such lessee is obligated to lease the building under an **agreement to lease** entered into before September 26, 1985 ...") (emphasis added). Such an amendment, of course, would have been unnecessary had Congress viewed the terms "agreement to lease" and "lease" as interchangeable. Indeed, other lan-

■ Still, without a specific statutory definition of the phrase "agreement to lease," there arguably is enough ambiguity in the clause "is obligated to lease under an agreement to lease" to warrant reference to the statute's legislative history. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). While that legislative history does not specifically define the phrase in question, it does strongly suggest that Congress intended the transitional rules to have a narrow application. Consistent with that history, the courts have generally observed that the transition rules of the Relief Act were enacted to provide relief "to a very, very few specified favored taxpayers," *Apache Bend,* 987 F.2d at 1175. *See also Commonwealth Energy Sys.,* 235 F.3d at 16; *Airborne Freight Corp. v. United States,* 153 F.3d 967, 970 (9th Cir.1998), *cert. denied,* 526 U.S. 1112, 119 S.Ct. 1755, 143 L.Ed.2d 787 (1999). As discussed below, section 204(a)(7) proves no exception to this observation, as various aspects of its legislative history indicate that it had, at most, two intended beneficiaries—the firms Merrill Lynch and Drexel Burnham Lambert.

House Resolution 3838, which contained the original draft of what ultimately became section 204(A)(7), was passed by the House of Representatives on December 16, 1985. On December 9, 1985, prior to passage, Representative Newt Gingrich from Georgia spoke on the floor of the House, railing against the "giveaways" created by the transitional rules and specifically citing Merrill Lynch as the intended beneficiary of the transitional rule applicable to the world headquarters exception. *See* 131 Cong. Rec. 35,285 (1985). Subsequent to its passage by the House, H.R. 3838 was referred to the Senate Finance Committee on May 29, 1986. On June 10, 1986, the Committee published in the Congressional Record the identities of the intended beneficiaries of the various transitional rules relating to the repeal of the investment tax credit, indicating therein, again, that Merrill Lynch was the sole intended beneficiary of the world headquarters transitional rule. *See* 132 Cong. Rec. 13,090 (1986). On June 17, 1986, the proposed investment credit transitional rules were assailed again, this time by Senator Howard Metzenbaum from Ohio, who, in successfully moving an amendment to limit the transition rules, again identified Merrill Lynch as the beneficiary of the provision in question. *See* 132 Cong. Rec. 14,113 (1986). Finally, on September 27, 1986, after the Senate had passed its version of the Reform Act, and the Conference Committee had issued its report modifying the bill, the Senate, at Senator Metzenbaum's behest, entered into the Congressional Record the intended beneficiaries of the transitional rules cross-referenced to the page of the Conference Report on which the particular rule was listed. Two entries in this listing reflect that Merrill Lynch was the intended beneficiary of section 204(a)(7)(A)-(C), and Drexel Burnham Lambert the beneficiary of the flush language in section 204(a)(7) added by the Conference Committee. 132 Cong. Rec. 26,638–40 (1986).[13]

guage in section 204(a)(7)(C) suggests that the statute was intended to cover only a company that had obligated itself to lease a building in the future, but had not yet occupied the structure. Thus, for example, the statute provides that the buildings to be leased "are to serve" as a world headquarters. This language is in a form of the future tense and ordinarily would not be understood to encompass property already serving as a headquarters—were the latter intended, Congress would have simply used the word "serves." *See* Charles Darling, *Guide to Grammar and Writing, at* http://ccc.commnet.edu/grammar/tenses/simple_future.htm (last modified 2001) ("The construction form of *to be* + infinitive is used to convey a sense of planning for the future, command, or contingency."); Anthony Hughes, *The Online English Grammar, at* http://www.edufind.com/english/grammar/ Tenses21.cfm (last modified 2001) ("This form refers to an *obli-*

*gation* to do something at a time later than now."). Indeed, at least two courts have observed that the "are to serve" language is "prospective," suggesting that it refers to a building that, as of the effective date of the transitional rule, was not yet being used as a world headquarters. *See Kjellstrom,* 916 F.Supp. at 907; *Payless Cashways,* 114 T.C. at 79.

13. To reach this conclusion requires a bit of deductive logic. As recounted in *Kjellstrom,* 916 F.Supp. at 905–06, the Congressional Record, in a list entitled "ACRS/ ITC: RULES IN HOUSE BILL AND HOUSE AND SENATE BILLS," indicates that Merrill Lynch, Sonat Offshore Drilling, Kern River Pipeline and Tri–Cities Sewage were the beneficiaries of the rules listed on page I–75 of the conference report. 132 Cong. Rec. 26,638–39 (1986). Four transitional rules were quoted on page I–75—the world headquarters

Now, of course, plaintiff is neither Merrill Lynch nor Drexel Burnham Lambert, and, despite the legislative history recited above, the court does not deem that fact dispositive. Clearly, Congress could have passed a provision intended to benefit one or two taxpayers and incidentally benefitted others. But, the legislative history outlined above does indicate that Congress intended the world headquarters exception to be limited.[14] By contrast, plaintiff's interpretation of that rule has an exceedingly broad berth. For example, under its reading of the statute, the credit would be extended to a taxpayer that had leased its corporate headquarters in 1969, during the period in which the Congress had suspended the investment tax credit; or in 1959, prior to the credit's initial passage; or even 1899, prior to the passage of the modern income tax.[15] In fact, plaintiff's interpretation would reach any taxpayer that was the original lessor of property, no matter how "old and cold" their lease, provided that lease was entered into some time between the beginning of time and September 25, 1986. Moreover, under plaintiff's view, Congress extended the credit to all these lessors of world headquarters, many of whom would have entered into their original leases prior to the investment tax credit even existing, while providing no transitional relief to other taxpayers who clearly had relied on the existence of the credit in making investment decisions and thus had much more compelling cases for relief—those who, for example, before the effective date of the repeal, carefully factored in the impact of the credit in choosing to purchase (rather than lease) a headquarters or to purchase or lease some other type of building. As such, plaintiff's interpretation of the transition rule would ascribe to Congress the logic-chopping intent of rewarding the unwitting, while shortchanging the witting.

While, as Mr. Justice McReynolds once stated, "[l]ogic and taxation are not always the best of friends," *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 522, 43 S.Ct. 643, 67 L.Ed. 1095 (1923), this court is loathe to attribute to Congress such an anomalous, yet sweeping, approach, without the flimsiest of textual support, and especially in the face of a contrary conference report, which clearly indicates that the "special transitional rules" are "of limited application." H.R. Conf. Rep. No. 99–841, at II–62 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4150.[16] This is not, as

---

transition rule, and rules pertaining to submersible drilling units, natural gas pipelines and waste or sewage treatment plants. Accordingly, it may readily be deduced that the world headquarters rule applied only to Merrill Lynch, while the other rules focused on the other three companies—a submersible drilling company, a gas pipeline company and a sewage treatment company. A second list in the Congressional Record, entitled "NEW HOUSE AND SENATE TRANSITION RULES–FINAL LIST" and subtitled "ACRS/ITC," lists the "Drexel Burnham Office Building" as an additional beneficiary of the Conference Committee version of the bill. 132 Cong. Rec. 26,640 (1986). That version of the bill added the last sentence of section 204(a)(7), *see* footnote 12, *supra*, leading the court to conclude that the flush language in that section was intended to benefit Drexel Burnham Lambert.

**14.** To be sure, the Supreme Court has "eschewed reliance on the passing comments of one Member ... and casual statements from the floor debates." *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (citations omitted). Here, however, we are faced not with a single, idle statement, but rather a pattern of statements—and one that is consistent not only with the Conference Committee Report's emphasis on the narrow scope of the transition rules, but also the statute's language itself. Accordingly, in this court's view, these statements of individual members are an accurate gauge of Congressional intent. *See Grove City College v. Bell*, 465 U.S. 555, 566–67, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984); *Kjellstrom*, 916 F.Supp. at 906. *See also* 2A *Sutherland Statutory Construction*, § 48.13 ("The statements of individual legislators ... can be given effect if they are consistent with statutory language and other legislative history which justifies reliance upon them as evidence of legislative intent.").

**15.** At oral argument, the court posed to plaintiff's counsel a series of hypotheticals, asking whether, under plaintiff's theory, the exception would apply to leases executed in the years indicated in the text (*i.e.*, 1969, 1959 and 1899). In each instance, plaintiff's counsel unabashedly answered that it would.

**16.** Striving for evidence to support its claim that Congress used the terms "lease" and "agreement to lease" interchangeably, plaintiff latches onto a portion of the legislative history of section 204(a)(3) of the Reform Act, which provision, like section 204(a)(7), discussed above, provided investment credit transitional relief to a taxpayer subject to "an agreement to lease." § 204, 100

plaintiff claims, a matter of "undertaking to put words into the statute that, whatever the reasons may have been, Congress did not put there," *International Trading Co. v. Commissioner*, 484 F.2d 707, 711 (7th Cir.1973), but rather of effectuating the words and intent of what the Congress actually enacted. And on both these important counts, NDC's arguments fall short. *Cf. United States v. Brown*, 333 U.S. 18, 27, 68 S.Ct. 376, 92 L.Ed. 442 (1948) ("[n]o rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences").

To be sure, this conclusion—that the transition rule applies only to parties obligated to lease under an "agreement to lease," but not a "lease"—has received a mix reception in the courts, with one prior decision supporting this court's view, *see United States v. Kjellstrom*, 916 F.Supp. 902 (W.D.Wis.1996), *aff'd on other grounds*, 100 F.3d 482 (7th Cir. 1996), and two others, including one by the Ninth Circuit, rejecting that conclusion, *see Airborne Freight Corp. v. United States*, 153 F.3d 967 (9th Cir.1998); *Kimberly–Clark Tissue Co. v. United States*, 38 F.Supp.2d 1028 (E.D.Wis.1999). In the Ninth Circuit case, the defendant apparently argued, as it did here, that:

> the exception should apply to taxpayers who were obligated to lease the building before September 26, 1985, but *had not leased the building by that date*. It also argued that, to qualify, the taxpayer must have agreed to lease the *entire* building. If these narrow constructions are not

adopted, according to the government, the purpose of the exception will be frustrated: taxpayers who agreed to lease and leased buildings decades before the repeal of the investment credit will be entitled to avail themselves of the transitional exception.

*Airborne Freight*, 153 F.3d at 970 (emphasis in original). The Ninth Circuit, however, made short shrift of this argument, stating:

> The difficulty with the government's argument is that none of the words italicized in the previous paragraph were written into § 204(a)(7). There is no disqualification of those who executed leases before September 26, 1985, and the government offers no reason why the execution of a lease creates a relevantly different condition from that which existed under an agreement to lease.... We decline therefore to write the government's additional proposed restrictions into the statute in order to confine the exception virtually to a class of one.

*Id.* Notwithstanding these comments, the court found that the statute incorporated a "reasonable expectation" test, indicating that "[w]e have no quarrel with the government's argument that, in light of its purpose, the exception should be available only to those whose expectations at the time they undertook their obligations would otherwise be defeated by the repeal of the investment credit." *Id.* The Ninth Circuit found that while Airborne "qualifies ... under such a guiding principle," "other companies that leased their world headquarters decades

Stat. at 2149. Plaintiff finds it significant that the Conference Committee report describing the "agreement to lease" language in section 204(a)(3) refers to it as involving "lease agreements." While this observation is true, *see* H.R. Conf. Rep. No. 99–841, at II–59 to II–60 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4147–48, it offers only empty solace to plaintiff, as can be seen when the quoted language is read in context:

> The bill provides transitional relief for certain situations where written binding contracts require the construction or acquisition of property, but the contract is not between the person who will own the property and the person who will construct or supply the property. This rule applies to written service or supply contracts and agreements to lease entered into before March 2, 1986 (January 1, 1986, in the

case of the investment tax credit). An example of a case to which this rule would apply would be lease agreements under which a grantor trust is obligated to provide property under a finance lease (to the extent continued under the bill).

*Id.* This passage makes apparent not only that the report's reference to "lease agreements" is to an "agreement to lease," but also that Congress used the term "agreement to lease" in section 204(a)(3) in a factual setting typical for that term—that is, where an individual agrees to lease in the future a building that has yet been constructed or acquired. Accordingly, far from supporting plaintiff's position, this snippet from the legislative history of the Reform Act actually constitutes further evidence that there is a real and meaningful distinction between a "lease" and an "agreement to lease."

ago" would not, concluding, on that basis, that its decision was "not likely to open the floodgates." *Id.* at 970–71.

With all due respect, this court finds Ninth Circuit's reasoning faulty on several counts.[17] First, the court of appeals failed to recognize that adopting defendant's position does not require the statute to be augmented, but merely enforced, by its terms. The case law outlined above reveals that there is a fundamental difference between an "agreement to lease" and a "lease"—a distinction apparently understood by the Congress, but lost on the Ninth Circuit. Second, the Ninth Circuit's interpretation of the statute comports neither with the ordinary rules of construction nor the relevant legislative history. On this count, it is beyond peradventure that, generally, the maxim that tax exceptions are construed narrowly and, specifically, the legislative history of this provision, both point toward the conclusion that Congress intended this exception to apply to a select few. *See Commonwealth Energy Sys.*, 235 F.3d at 16. The Ninth Circuit clearly betrayed that intent in eschewing a reasonable, narrow construction of the statute in favor of an apocryphal, yet broader version thereof. Finally, perhaps bothered by the last point, the Ninth Circuit ultimately hinged its ruling on a legal fiction—that section 204(a)(7) directly imposes a separate and distinct "reasonable expectation" requirement—so that only taxpayers who met the statute's express terms **and** entered into transactions based upon the reasonable expectation of receiving an investment tax credit should be eligible. In this regard, it appears the Ninth Circuit is guilty of the very sin that it wrongly accused the

defendant of committing—a bit of statutory *joie de revision*—minting an eligibility requirement that has no antecedent in the statute's language.[18] Adopting this "reasonable expectation" principle, purportedly as a limitation on its ruling, actually freed the appellate court to brush aside the obvious clash between its sweeping interpretation and what Congress intended.[19] Thus, after careful analysis, this court respectfully concludes that the Ninth Circuit's opinion proves both too little and too much. For this and the other reasons stated, this court, therefore, respectfully rejects both the rationale and conclusion reached in *Airborne Freight* and *Kimberly–Clark Tissue*.

In sum, the text of the Reform Act, as illuminated by the statute's legislative history, the various statutory canons of construction, and common law, forecloses the construction of section 204(a)(7) urged by NDC. As such, this court concludes that, with respect to the taxable years in question, NDC did not meet section 204(a)(7)(B)'s requirement that a taxpayer "is obligated to lease the building under an agreement to lease entered into before September 26, 1985." § 204, 100 Stat. at 2155. Therefore, it is not entitled to the transition rule exception from the general repeal of the investment tax credit.

## III. Conclusion

For the foregoing reasons, the court concludes that plaintiff is not entitled to the claimed investment tax credits. Accordingly, the defendant's motion for summary judgment is **GRANTED**, and the plaintiff's cross-

---

17. The district court decision in *Kimberly–Clark Tissue Co., supra,* essentially adopted the same reasoning as the Ninth Circuit and, in this court's view, suffers from the same flaws.

18. To be sure, in drafting the transition rules, Congress did focus on taxpayers who had made economic decisions relying upon the existence of the investment tax credit. But, it effectuated that intent not directly, by imposing a separate reliance requirement in the statute, but indirectly, by drafting eligibility requirements that logically could be met only by taxpayers who reasonably relied upon the existence of the credit. In contrast, having construed that statutory language broadly in a way that clearly defeated Congress' intent, the Ninth Circuit then proceed-

ed to reintroduce the reliance concept as a separate and distinct nonstatutory gloss on its otherwise broad interpretation.

19. On this point (and others), the court agrees with the district court in *Kjellstrom,* which stated:

Nothing in the legislative history indicates that Congress intended to provide an exemption for *all* taxpayers who had leased world headquarters buildings prior to 1985 and as early as 1974. To read the statute this broadly would undermine Congress's intent as it is evidenced in the legislative history to the Tax Reform Act. 916 F.Supp. at 907.

motion for summary judgment is **DENIED.** The Clerk shall dismiss the complaints in Case Nos. 97–23 T and 97–580 T.